[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 83.]

THE STATE OF OHIO, APPELLEE, *v*. IACONA, APPELLANT.

[Cite as *State v. Iacona*, 2001-Ohio-1292.]

*Juvenile court—Transfer of case for criminal prosecution—Prosecutor under duty to disclose to juvenile respondent all evidence in state's possession favorable to juvenile respondent and material either to guilt or punishment that is known at time of mandatory bindover hearing held pursuant to R.C. 2151.26 and that may become known to prosecuting attorney after bindover—In determining whether reversible error is committed where state fails to disclose evidence in its possession that is favorable to juvenile respondent for use by defense at mandatory bindover proceeding, defense has burden to prove that violation was material— Requirements to support finding that probable cause exists to believe juvenile committed offense before ordering mandatory waiver of juvenile court jurisdiction pursuant to R.C. 2151.26(B).*

(No. 00-495—Submitted January 10, 2001—Decided August 29, 2001.)

APPEAL from the Court of Appeals for Medina County, No. 2891-M.

_____

SYLLABUS OF THE COURT

1. A prosecutor is under a duty imposed by the Due Process Clauses of the Ohio Constitution and the United States Constitution and Juv.R. 24 to disclose to a juvenile respondent all evidence in the state's possession favorable to the juvenile respondent and material either to guilt or punishment that is known at the time of a mandatory bindover hearing held pursuant to R.C. 2151.26 and that may become known to the prosecuting attorney after the bindover.

2. In determining whether reversible error is committed where the state fails to disclose evidence in its possession that is favorable to a juvenile respondent

for use by the defense at a mandatory bindover proceeding, the defense has the burden to prove that the violation was material, *i.e.*, that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the mandatory bindover hearing would have been different.

3. The state must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense before ordering mandatory waiver of juvenile court jurisdiction pursuant to R.C. 2151.26(B).

_____

**MOYER, C.J.**

**{¶ 1}** Appellant, Audrey Iacona, was convicted of involuntary manslaughter and other crimes in connection with the death of her child.[1] We have reviewed the record and fully considered her contentions of trial error. Having done so, we acknowledge that Iacona was not afforded a perfect trial. She did, however, receive a fair trial. We therefore affirm the judgment of the court of appeals, which affirmed her convictions but remanded to the trial court for resentencing.

I

*Facts*

**{¶ 2}** On May 1, 1997, then seventeen-year-old Iacona went into the basement of her parents' home and gave premature birth to Baby Boy Iacona.

**{¶ 3}** After cutting the umbilical cord, she returned upstairs. Iacona then called Lynn Scherma, a friend, and informed her that she had given birth and that the baby was dead.

**{¶ 4}** After speaking with Iacona, Scherma called her father, who called the local police department. He informed the police that there was a possibly dead newborn in the basement of the home of Iacona's parents, Mark and Angela Iacona.

_____

1. During trial, the parties entered stipulations referring to the child as "Baby Boy Iacona." We use this designation herein.

**{¶ 5}** Upon arriving at the Iacona home, an officer informed Iacona's parents about the phone call and was invited into the foyer. After receiving permission from Angela Iacona to look around the basement, the officer went downstairs. While in the basement, the officer observed two wet spots on the floor he suspected might be blood. Returning upstairs, the officer asked Iacona and her parents to remain on the main floor until the other officers arrived.

**{¶ 6}** Shortly thereafter, a number of Medina County sheriff deputies arrived and conducted a fuller search of the Iacona residence. During the search, a second officer noticed the wet spots on the floor and identified them as drops of blood measuring about four or five inches in diameter. Another officer estimated that there were as many as nine blood spots on the floor. He also discovered scissors with a bloodstain on the blades in the basement. The upstairs bathroom had blood spots on the floor, and there was blood found in the toilet. Eventually, the officers found bloody clothes and towels, as well as a recently used sanitary napkin.

**{¶ 7}** While the search was progressing, officers spoke with Iacona and her parents. Iacona explained that the spots in the basement were menstrual blood. In response to direct questions, Iacona denied being or having ever been pregnant.

**{¶ 8}** In the basement, one of the officers found a pink blanket covering the top of a white plastic bag. The officer removed the blanket from the bag. He then opened the bag, which had been "tucked closed." Inside this bag was a second bag, also tucked closed. The officer opened the second bag and discovered a bloodstained blue towel. He opened the towel and discovered that it contained a newborn child. The baby was dead.

**{¶ 9}** The state thereafter initiated juvenile proceedings against Iacona, alleging in a two-count complaint that she was a delinquent child by virtue of having committed murder, in violation of R.C. 2903.02, or involuntary manslaughter, in violation of R.C. 2903.04(A). The prosecuting attorney moved

for transfer of jurisdiction over Iacona to the Medina County Court of Common Pleas pursuant to the mandatory bindover provisions of R.C. 2151.26(B)(3)(a).[2]

{¶ 10} Approximately four days before the bindover hearing, appellant's counsel served the prosecutor with a demand for discovery. The demand specifically referenced "[t]he report or results of any physical or mental examination or scientific tests or experiments made in connection with this matter" as authorized by Juv.R. 24(A)(4).[3]

{¶ 11} At the bindover hearing in June 1997, the state introduced an autopsy report prepared by Dr. Chistin Rolf, a pathologist employed by the Cuyahoga County Coroner's Office, to whom the Medina County Coroner had sent the body for autopsy. Dr. Rolf described the child as being a "male fetus of 32 weeks estimated gestational, postnatal death." The autopsy report characterized the baby's cause of death as "asphyxia by insertion of body into plastic bag." Dr. Rolf testified that her conclusion as to the cause of death was based largely on the

---

2. R.C. 2151.26 provides:
    "(A) As used in this section:
    "(1) 'Category one offense' means any of the following:
    "(a) A violation of section 2903.01 or 2903.02 of the Revised Code.
    "* * *
    "(B) After a complaint has been filed alleging that a child is a delinquent child for committing an act that would be an offense if committed by an adult, the court at a hearing shall transfer the case for criminal prosecution to the appropriate court having jurisdiction of the offense if the child was fourteen years of age or older at the time of the act charged, if there is probable cause to believe that the child committed the act charged, and if one or more of the following applies to the child or the act charged:
    "* * *
    "(3) The act charged is a category one offense, and either or both of the following apply to the child:
    "(a) The child was sixteen years of age or older at the time of the act charged."

3. Juv.R. 24 provides:
    "(A) Upon written request, each party of whom discovery is requested shall, to the extent not privileged, produce promptly for inspection, copying, or photographing the following information, documents, and material in that party's custody, control, or possession:
    "* * *
    "(4) Any scientific or other reports that a party intends to introduce at the hearing or that pertain to physical evidence that a party intends to introduce;
    "* * *
    "(6) * * * In delinquency and unruly child proceedings the prosecuting attorney shall disclose to respondent's counsel all evidence, known or that may become known to the prosecuting attorney, favorable to the respondent and material either to guilt or punishment."

reported circumstances surrounding the discovery of the body, *i.e.*, that the baby was found wrapped in a towel and inserted into two plastic bags. She indicated that she had found no purely medical explanation for the child's death.

{¶ 12} Dr. Neil Grabenstetter, the Medina County Coroner, testified that he ruled the death a homicide, based on the Cuyahoga County autopsy report and the results of the police investigation. Dr. Grabenstetter further testified that as far as he knew, no blood cultures had been conducted in connection with the autopsy of Baby Boy Iacona.

{¶ 13} In fact, although apparently unknown to Dr. Grabenstetter, Dr. Rolf had taken a blood sample from the interior of the baby's heart during autopsy, and sent it to a laboratory for testing. Within approximately a week after the baby's death, and well before the juvenile bindover hearing, the laboratory completed its report and sent it to the Cuyahoga County Coroner's Office. The report indicated that the blood sample, when analyzed, disclosed the presence of a potentially deadly bacterium, group A streptococcus. The report had not been provided to the defense prior to the bindover hearing.

{¶ 14} Following the hearing, the juvenile court entered judgment, without written opinion, that probable cause existed to believe that Iacona had committed murder and was sixteen years of age or older at the time of the commission of the act charged. The juvenile court therefore relinquished its jurisdiction over her and transferred the case to the Medina County Court of Common Pleas.

{¶ 15} The Medina County Grand Jury subsequently indicted Iacona on one count of murder, in violation of R.C. 2903.02; two counts of involuntary manslaughter, in violation of R.C. 2903.04(A); and two counts of endangering children in violation of R.C. 2919.22.[4] Iacona was also charged with one count of abuse of a corpse, a violation of R.C. 2927.01(B).

---

4. R.C. 2919.22 provides:

**{¶ 16}** After Iacona unsuccessfully moved to suppress evidence obtained during the search and of any statements made without the benefit of *Miranda* warnings, the matter proceeded to a jury trial.

**{¶ 17}** The jury found Iacona guilty of both involuntary manslaughter counts, both child-endangering counts, and the abuse-of-a-corpse count. It could not reach a verdict as to the murder count. The trial court sentenced Iacona to eight years' imprisonment on each count of involuntary manslaughter, to three years' imprisonment on each count of child endangering, and to six months on the abuse-of-a-corpse count. The court ordered the sentences to run concurrently.[5]

**{¶ 18}** Iacona thereafter moved for a new trial pursuant to Crim.R. 33(A)(1), (3), and (6), claiming "irregularities in the proceedings, surprise production of discoverable exculpatory evidence late in the trial and the withholding of discoverable evidence material to the defense, which evidence came to defendant's knowledge by way of inadvertent exposure by the prosecutor during the cross-examination of [a] defense medical expert." Iacona asserted that as a result of the withholding of evidence she was denied a fair trial and denied the effective assistance of counsel. The motion was overruled.

---

"(A) No person, who is the parent * * * of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *

"(B) No person shall do any of the following to a child under eighteen years of age * * *:

"(1) Abuse the child;

"* * *

"(E)(1) Whoever violates this section is guilty of endangering children.

"(2) If the offender violations division (A) or (B)(1) of this section, endangering children is one of the following:

"* * *

"(c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree.

"(d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree."

5. At trial Iacona did not challenge the legitimacy of entry of conviction on all of these counts as violative of R.C. 2941.25. The courts of appeals in Ohio disagree on the question whether a trial court commits error in failing to set aside a conviction of a lesser allied offense of similar import when the sentence imposed on the lesser offense is to be served concurrently with the sentence for the heightened offense. See, generally, *State v. Fenwick* (2001), 91 Ohio St.3d 1252, 1254-1255, 745 N.E.2d 1046, 1047-1048, dismissed as improvidently allowed (Moyer, C.J., dissenting).

{¶ 19} Iacona appealed her convictions to the Ninth District Court of Appeals, which affirmed all of the convictions, but found sentencing error in that the trial court had failed to make R.C. 2929.14(B) findings on the record. Such findings are required if a first-time offender is to receive more than the minimum term. See *State v. Edmonson* (1999), 86 Ohio St.3d 324, 715 N.E.2d 131. Accordingly, the court of appeals reversed Iacona's sentence and remanded for resentencing.

{¶ 20} The cause is now before this court upon our allowance of a discretionary appeal.

{¶ 21} We address Iacona's assertions of reversible error in chronological order.

## II

### *The Search of the Iacona Home*

{¶ 22} Iacona challenges the validity of the search of her parents' home and the admissibility of statements made during that search.

{¶ 23} As did the court of appeals, we find that the trial court did not err in refusing to suppress evidence obtained pursuant to this search. The record fully supports the finding of the trial court that Mr. and Mrs. Iacona voluntarily gave the investigating officers consent to search their home, and did not thereafter withdraw that consent. Moreover, "a parent who owns or controls the premises in which a child resides has the right to consent to a search thereof even though such search may produce incriminating evidence against the child." *State v. Carder* (1966), 9 Ohio St.2d 1, 10, 38 O.O.2d 1, 6, 222 N.E.2d 620, 627.

## III

### *Alleged Brady v. Maryland Violations in Juvenile Court*

{¶ 24} In the landmark case of *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, the United States Supreme Court held that a criminal defendant may claim denial of due process where the state fails to disclose the

existence of potentially exculpatory evidence. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 86, 83 S.Ct. at 1196-1197, 10 L.Ed.2d at 218. But, "[i]n determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense." *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph five of the syllabus, following *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. See, also, *State v. Treesh* (2001), 90 Ohio St.3d 460, 475, 739 N.E.2d 749, 767.

**{¶ 25}** Iacona argues that the doctrine of *Brady v. Maryland* applies with full force to juvenile bindover proceedings. The state argues that *Brady* does not apply.

**{¶ 26}** Iacona further contends that the prosecution violated the *Brady* doctrine by failing to provide her defense with the blood culture report showing group A streptococcus prior to the bindover hearing. She asserts that the case should be remanded to the juvenile court with instructions to conduct new bindover proceedings.

**{¶ 27}** We address each of these contentions separately.

A

*Applicability of the Doctrine of Brady v. Maryland to Juvenile Court Mandatory Bindover Hearings*

**{¶ 28}** In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is *material either to guilt or to punishment*, irrespective of the good faith or bad faith of the prosecution."  (Emphasis added.) *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-1197, 10 L.Ed.2d at 218.

{¶ 29} It is axiomatic that the juvenile court has exclusive original jurisdiction of children alleged to be delinquent based on commission of an act that would constitute a crime if committed by an adult.  R.C. 2151.23(A)(1) and 2151.02(A); *State v. Golphin* (1998), 81 Ohio St.3d 543, 544-545, 692 N.E.2d 608, 610.  However, the law has long provided that, under circumstances prescribed by the General Assembly, the juvenile court may transfer the case to the common pleas court for prosecution and potential sentencing of the accused juvenile as an adult.  R.C. 2151.26(C).  See, also, *State v. Carmichael* (1973), 35 Ohio St.2d 1, 4, 64 O.O.2d 1, 2-3, 298 N.E.2d 568, 570-571, quoting R.C. 2151.26 as in effect in 1971 (133 Ohio Laws, Part II, 2049); *State v. Frohner* (1948), 150 Ohio St. 53, 37 O.O. 406, 80 N.E.2d 868, paragraph eight of the syllabus, citing G.C. 1639-32.

{¶ 30} In 1996 the General Assembly amended R.C. 2151.26 to provide that, under certain circumstances, a juvenile court *must* transfer jurisdiction over the child to the common pleas court for prosecution as an adult.  R.C. 2151.26(B), 146 Ohio Laws, Part I, 1, 18.  As amended, R.C. 2151.26(B)(3)(a) requires mandatory bindover where, as in this case, the child was age sixteen or over at the time of the offense, and the juvenile judge finds probable cause to believe that the child committed a "category one" offense, including the crime of murder in violation of R.C. 2903.02.  See R.C. 2151.26(A)(1).

{¶ 31} This court has recently observed that "[s]ince its origin, the juvenile justice system has emphasized individual assessment, the best interest of the child, treatment, and rehabilitation, with a goal of reintegrating juveniles back into society. * * *

{¶ 32} "In the early juvenile justice system, although the child was accused of a criminal offense, many of the formal criminal procedures in adult court were

omitted. * * * While some of the formal adult court procedures have been adopted since then, the language of the proceedings today still reflects the rehabilitative goals of the juvenile justice system." *State v. Hanning* (2000), 89 Ohio St.3d 86, 88-89, 728 N.E.2d 1059, 1061. See, also, *In re Anderson* (2001), 92 Ohio St.3d 63, 65, 748 N.E.2d 67, 69. Accord R.C. 2151.01(A) and (B), which list among the purposes of the juvenile justice system the goals of providing for the "care, protection, and mental and physical development of children subject to Chapter 2151 of the Revised Code," and ensuring the protection of "the public interest in removing the consequences of criminal behavior and the taint of criminality from children committing delinquent acts," substituting therefor a "program of supervision, care, and rehabilitation" rather than punishment. This is so even where the juvenile thereafter is ordered confined in a juvenile facility.

{¶ 33} Moreover, when a juvenile is adjudicated a delinquent, any institutionalization or confinement which may be ordered may not "exceed the child's attainment of twenty-one years of age." R.C. 2151.355(A)(4). Even for the most serious crimes of aggravated murder and murder the law limits commitment of the child to the legal custody of the Department of Youth Services "for institutionalization in a secure facility until the child's attainment of twenty-one years of age." R.C. 2151.355(A)(6).

{¶ 34} Consequently, where, as in the case at bar, a minor is age seventeen at the time of the murder, a minor retained in the juvenile system would be subject to the state's custody for no longer than four years. The same minor bound over to the court of common pleas to face trial as an adult on a charge of murder faces a potential life term of incarceration. R.C. 2929.02(B). Mandatory bindover, and diversion out of the juvenile justice system, undeniably affects the length of confinement to which an accused minor is exposed.

{¶ 35} The issues determined at a mandatory bindover hearing are therefore a "critically important" stage in juvenile proceedings. Therefore, such a hearing

must "measure up to the essentials of due process and fair treatment." *Kent v. United States* (1966), 383 U.S. 541, 562, 86 S.Ct. 1045, 1057, 16 L.Ed.2d 84, 98.

{¶ 36} The court in *Kent* recognized that a juvenile's right to a hearing includes the right of access to any social records that would be considered by the court in determining waiver of jurisdiction. We believe that basic principles of fairness and due process similarly require that counsel for a juvenile be provided access to information possessed by the state that might tend to disprove probable cause at the bindover stage. It is clear that the decision made there is material to punishment, as contemplated by *Brady.*

{¶ 37} Moreover, irrespective of the mandate of the United States Constitution as explicated in *Brady* and its progeny, and *Kent*, Juv.R. 24(A)(6) imposes a duty, corresponding to that imposed by *Brady*, that "[i]n delinquency and unruly child proceedings, the prosecuting attorney shall disclose to respondent's counsel all evidence, known or that may become known to the prosecuting attorney, favorable to the respondent and material either to guilt or punishment." We discern no reason why this rule, in the interest of fairness, should not be applied at the mandatory bindover hearing stage.

{¶ 38} We therefore hold that a prosecutor is under a duty imposed by the Due Process Clauses of the Ohio Constitution and the United States Constitution and Juv.R. 24 to disclose to a juvenile respondent all evidence in the state's possession favorable to the juvenile respondent and material either to guilt or punishment that is known at the time of a mandatory bindover hearing held pursuant to R.C. 2151.26 and that may become known to the prosecuting attorney after the bindover.

B

*Alleged Violation of Brady Doctrine in Mandatory Bindover Proceedings in the*

*Case at Bar*

{¶ 39} It is undisputed that a laboratory report showing the presence of group A streptococcus in a sample of Baby Boy Iacona's blood was received by the Cuyahoga County Coroner's Office within days of the child's death. The state vigorously asserts that it provided the defense with a copy of that report after bindover but well before the trial in the court of common pleas, and that it was not aware of the existence of the report at bindover. It is undisputed, however, that the defense did not have a copy of the report before or during the bindover proceedings.

{¶ 40} Iacona argues that the state's failure to disclose the existence of that blood culture report prior to the bindover hearing is fatal to a valid relinquishment of juvenile court jurisdiction to the common pleas court. Moreover, she avers that the state committed prejudicial error in failing to correct the coroner's testimony that no blood culture had been performed, even though the prosecution purportedly was not aware at the time of the testimony that a blood culture had been performed as part of the autopsy of the baby. Iacona asserts that these alleged errors were material to the probable cause decision. We address each contention in turn.

1

*Nondisclosure of the Blood Culture Report*

{¶ 41} Pursuant to our holding that *Brady* applies in juvenile court mandatory bindover proceedings, and in satisfaction of the state's obligations under Juv.R. 24, we conclude that the prosecution should have provided the blood culture laboratory report to the defense in time for use at the bindover hearing. The report was in the possession of the Cuyahoga County Coroner's Office about six weeks before the bindover hearing. "The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." *United States v. Payne* (C.A.2, 1995), 63 F.3d 1200, 1208. The question remains whether the state's failure to comply with this duty requires reversal of Iacona's conviction and remand to the juvenile court.

**{¶ 42}** In reviewing this issue we remain mindful that it is the burden of the defense to prove a *Brady* violation rising to the level of denial of due process. *State v. Jackson* (1991), 57 Ohio St.3d 29, 33, 565 N.E.2d 549, 555, citing *Talamante v. Romero* (C.A.10, 1980), 620 F.2d 784; *Monroe v. Blackburn* (C.A.5, 1979), 607 F.2d 148. See, also, *State v. Wickline* (1990), 50 Ohio St.3d 114, 117, 552 N.E.2d 913, 917. In order to find reversible error based upon a *Brady* violation, we must find that the violation was material. We therefore hold that in determining whether reversible error is committed where the state fails to disclose evidence in its possession that is favorable to a juvenile respondent for use by the defense at a mandatory bindover proceeding, the defense has the burden to prove that the violation was material, *i.e.*, that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the mandatory bindover hearing would have been different. We accordingly review the record to determine whether there is a reasonable probability that, had the blood culture report been disclosed to Iacona's defense prior to the bindover hearing, the result of that hearing would have been different, *i.e.*, that the juvenile court would not have found probable cause that Iacona had committed murder.

**{¶ 43}** As the court of appeals in the instant case correctly observed, a juvenile court at a bindover hearing need not " 'find as a fact that the accused minor is guilty of the offense charged. It simply finds the existence of probable cause to so believe,' " quoting *State v. Whiteside* (1982), 6 Ohio App.3d 30, 36, 6 OBR 140, 146, 452 N.E.2d 332, 338. The juvenile court in the case at bar described its responsibility in considering the issue of probable cause as being an obligation to determine whether there is "some credible evidence as to each and every element of the offense." The court of appeals, on the other hand, defined "probable cause" as "a flexible concept, grounded in probabilities, requiring more than a mere suspicion of guilt but a degree of proof less than that required to sustain a conviction," citing *Brinegar v. United States* (1949), 338 U.S. 160, 175, 69 S.Ct.

1302, 1310-1311, 93 L.Ed. 1879, 1890.   These two standards, while subtly different, are not irreconcilable.

{¶ 44} We hold that the state must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense before ordering mandatory waiver of juvenile court jurisdiction pursuant to R.C. 2151.26(B).  See Zarzycki, A Current Look at Ohio's Juvenile Justice System on the 100th Anniversary of the Juvenile Court (1999), 47 Cleve.St.L.Rev. 627, 647.   In meeting this standard the state must produce evidence that raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.

{¶ 45} Accordingly, in determining the existence of probable cause the juvenile court must evaluate the quality of the evidence presented by the state in support of probable cause as well as any evidence presented by the respondent that attacks probable cause.  See *Kent,* 383 U.S. at 563, 86 S.Ct. at 1058, 16 L.Ed.2d at 98.  In the case at bar, the juvenile court acted in compliance with this standard in examining whether probable cause existed that Iacona was guilty of murder in violation of R.C. 2903.02.

{¶ 46} The state presented evidence at the bindover hearing that Baby Boy Iacona was born alive, breathed for a period of time long enough to evenly aerate the lungs and produce air in the stomach and small bowel.  The state established that the baby was found dead, wrapped inside a towel having been placed within two white plastic bags, then covered by a blanket.  It produced expert testimony that living babies die of asphyxiation when placed inside plastic bags in this manner.

{¶ 47} The state further produced evidence that appellant had told her friends not to worry about her pregnancy, that she would "handle it when it comes"; that on the day she delivered, she first told a friend she thought she was in labor, and thereafter in a phone call around 3:00 p.m. told the friend "it was taken care

of" and that the baby "was dead when it came out." In addition, the state called the coroner who had officially ruled the cause of Baby Boy Iacona's death to be homicide.

{¶ 48} The crux of Iacona's argument is that the blood culture report proves that her son died of natural causes and not from suffocation at her hand. She argues that Baby Boy Iacona was doomed at the time of birth to die from a devastating bacterial infection and that her actions after delivery did not cause the baby's death. She contends that the trial court would not have found probable cause that she committed murder had she had possession of the report at the time of the bindover hearing.

{¶ 49} In so arguing, Iacona necessarily assumes that the juvenile court would have accepted the conclusion of her experts and rejected those of the state's experts. There is no basis for making such an assumption.

{¶ 50} Had Iacona had the report at bindover the juvenile court hearing likely would have resembled the hearing on her motion for a new trial held following her conviction. At that hearing Iacona presented expert testimony from a physician, board-certified in both internal medicine and infectious diseases, who testified that the presence of group A streptococcus in blood drawn from the baby's heart caused him to conclude that the baby had become infected and that the baby's death "was caused by Group A Strep infection." A forensic pathologist and clinical associate professor at the University of Chicago likewise testified for Iacona it was "[e]xtremely unlikely" that the presence of the group A streptococcus was the result of contamination. Another physician board-certified in anatomical and forensic pathology opined that the baby had died from septicemia, which he defined as "the presence of bacteria or some organisms in the bloodstream," which led to septic shock and death. In short, the defense theory argued that the infant died from septicemia—not asphyxia.

**{¶ 51}** At the new trial hearing, the state rebutted Iacona's experts by presenting the testimony of its own expert witnesses, who expressly discounted the defense's infection theory. Dr. Rolf's supervisor in the Cuyahoga County Coroner's Office testified that he had reviewed the autopsy case file, and that the blood culture report *had* been considered in determining the cause of death, but the group A streptococcus had been rejected as caused by an irrelevant contaminant. He testified that "[t]he complete information related to this case, including the findings at the hospital of the mother, the examination of the infant, the examination of the membranes, and all, show there was no significant inflammation or infection anywhere, and there was absolutely nothing to indicate that there was an infection anywhere in either the mother or in the infant." He remained adamant that the initial determination of cause of death was correct, *i.e.*, that being asphyxia by insertion of the baby into a plastic bag.

**{¶ 52}** Similarly, the Coroner of Cuyahoga County testified at the new trial hearing that she had reviewed the autopsy procedure, the protocol and the findings, and that she agreed with the finding of the cause of death of Baby Boy Iacona as asphyxia by insertion of his body into a plastic bag. She specifically testified that "[t]he blood culture result does not play any part in the cause of death."

**{¶ 53}** Other physicians, including a medical examiner for Summit County, testified on behalf of the state at the hearing on motion for a new trial that the child had asphyxiated, and that the positive blood culture had no relationship whatsoever to the death of the child.

**{¶ 54}** Further, the Medina County Coroner testified at the bindover hearing that the police investigation and the autopsy suggested that some person had played an active role in the death and that, even if another possible cause of death had existed, such as an Rh factor differential, he would have reached the same conclusion as to the manner of death, that being homicide.

{¶ 55} At the close of the bindover hearing the juvenile court explained its finding of probable cause that Iacona had committed murder:

"[T]he Court's obligation was to find some credible evidence as to each and every element of the offense.

"* * *

"* * *[T]he court found significance in [Mrs. Iacona's] testimony that there was no other persons in basement [*sic*]. She was able to identify the age of her daughter, the venue, and set the time frame within which this alleged incident occurred.

"Detective Warren Walter testified with regard to blood that was found on the premises. Detective Davis's testimony focused on the exhibits, his finding of the child, and the condition of the child.

"Dr. Rolf testified with regard to her findings in the autopsy report; that she found air in the lungs and in the stomach; that the baby was, in fact, born alive; that she could determine no natural cause for the baby's death; and further, that she discounted any other rationale for the death or for her physical findings. She drew her conclusion even despite the fact that there is, in fact, difficulty obtaining scientific evidence relating to asphyxia in an infant; and after consultation with her colleagues, she still was able, based on a reasonable medical certainty to make the causative finding of death by asphyxia.

"Miss Paul testified with regard to the baby being born in the basement, and Miss Iacona's knowledge of the pregnancy.

"Again, Dr. Grabenstetter supported the testimony of Dr. Rolf. He discussed the circumstances of the investigation which gave rise to his ultimate finding. He discussed the autopsy findings, and did, in fact, make his finding as to the manner of death as one of homicide.

"He further testified with regard to the issue of the utilization of the blanket and the impact of the blanket with regard to the asphyxia of the child.

"Once again, despite a number of hypotheticals that were presented, based not only on his investigation but on the evidence produced, he did not waiver from his decision based on a medical certainty. He did, in fact, take into account these other possibilities, and still did not deviate from his original ruling or finding.

"Miss Scherma testified with regard to the birth of the child, the location of the child, and her encouragement to Miss Iacona of obtaining care for the child and talking to her parents or, in fact, going to the hospital, which the Court finds to be significant in terms of intent.

"Therefore, it is this Court's judgment that there is probable cause to believe that the child committed the acts contained in Revised Code Section 2903.02; that the act charged is a Category 1 offense, and the child was 16 years of age or older, and therefore, the Court orders bind over to the Court of Common Pleas in this matter."

{¶ 56} As demonstrated by the evidence presented at the hearing on the motion for new trial, the juvenile court would have considered the same prosecution theory of the case even if the defense had been provided the report prior to the bindover hearing. That evidence was credible, even if not unassailable.

{¶ 57} We are confident that the juvenile court would have found probable cause to believe that Iacona had committed murder irrespective of the state's failure to produce the blood culture report prior to the bindover hearing. Even if the blood culture had been timely disclosed, the juvenile court would have had before it only dueling experts. Determination of the merits of the competing prosecution and defense theories, both of which were credible, ultimately was a matter for a factfinder at trial.

{¶ 58} We therefore find that Iacona has failed to meet her burden of demonstrating that disclosure of the blood culture report to the defense prior to the bindover hearing would have caused the trial court to come to a different conclusion on the determinative issue of probable cause that murder had been committed. That

being so, nondisclosure of the blood culture report prior to the bindover hearing was not a material omission on the part of the state or fatal to Iacona's bindover.

2

*Allegedly False Testimony at Bindover*

**{¶ 59}** At the bindover hearing, the Medina County Coroner testified that "as far as he [knew]" no blood cultures had been conducted. The defense claims that the state violated appellant's right to due process by allowing that testimony to stand uncorrected in light of the fact that the state was then in possession of the laboratory report showing blood culture results positive for group A streptococcus.

**{¶ 60}** "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Lochmondy* (C.A.6, 1989), 890 F.2d 817, 822, citing *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381, 87 L.Ed.2d at 491. Such a claim is in the nature of an allegation of prosecutorial misconduct, and the burden is on the defendant to show that "(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Id.*, citing *United States v. O'Dell* (C.A.6, 1986), 805 F.2d 637, 641. Applying this standard to the case at bar, we do not find a due process violation.

**{¶ 61}** Dr. Grabenstetter's statement was, by its own terms, limited to his own personal knowledge. He gave a qualified answer that, *as far as he knew*, no culture had been conducted. Iacona simply has not proven that Grabenstetter in fact knew of the existence of the cultures and knowingly testified to the contrary.

**{¶ 62}** Moreover, as discussed *supra*, we are confident that the juvenile court judge would have found probable cause that Iacona committed murder even if the blood culture report had been introduced. Since it is unlikely that the *actual results* of the report would have changed the probable cause determination, then the testimony of one witness about his knowledge as to whether the test had even been conducted would not likely have changed the outcome. We therefore cannot say

that the state's failure to correct this witness's qualified answer would have changed the juvenile court's evaluation of probable cause that murder had been committed.

{¶ 63} Accordingly, we find that Iacona's complaints regarding the validity of Iacona's bindover from juvenile court are not well taken.

IV

*Proceedings at Trial in Common Pleas Court*

A

*Alleged Deprivation of Due Process at Trial Based on Nondisclosure of the Blood Culture Report*

{¶ 64} Iacona asserts several arguments relative to presentation of alleged false testimony and the disclosure of the blood culture report during the final stages of the defense case at trial.

{¶ 65} At trial, Iacona argued that her baby had either been dead at the time of delivery or had appeared dead and died shortly after birth, and would have died regardless of her actions after having given birth. In support of her theory, she called a specialist in neonatology at the University of Chicago as an expert witness. He testified that about one in one hundred babies born at the University of Chicago is born moribund, *i.e.*, with no apparent respiratory reflex, and that a vast majority of them die, even if resuscitated. When asked whether blood cultures are done after the deaths of these infants, the physician testified that they often are, "because infection is a fairly common cause of premature delivery, and a fairly common cause of moribund premature delivery." He further testified that he had found no record that any blood cultures of this nature were done in the case of Baby Boy Iacona.

{¶ 66} During cross-examination of this witness, the state showed the expert the blood culture report, identified at that point as State's Exhibit 77, which indicated that the vial of blood taken from the baby's heart demonstrated the

presence of the bacterium group A streptococcus. When the prosecutor presented the report to the expert, the following exchange took place:

"Q. [Prosecutor] Assuming that page 2 shows cultures were done of Baby Boy Iacona, at the order of the Cuyahoga County Coroner's office—

"A. [Expert Witness] Yeah, it looks like they were positive.

"* * *

"What you asked me on [State's Exhibit] 77, it says group A streptococcus.

"Q. Group A?

"A. Right. * * * It looks like the culture of the blood was positive.

"Q. You have criticized the autopsy of this baby for there being no culture?

"A. I didn't say anything like that. I said I didn't see a culture.

Now I see a culture, and it is positive. That is, to me, impressive.

"* * *

"Q. Doctor, that was provided to [defense counsel] in October—

"[Defense Counsel] That is absolutely untrue."

{¶ 67} As later demonstrated at the hearing on Iacona's motion for new trial, the evidence is conflicting as to whether the prosecution had provided the report to the defense prior to this time. The state produced evidence supporting the conclusion that the prosecutor had disclosed the blood culture report well before the trial. An Assistant Medina County Prosecuting Attorney testified that she had been present when the culture report was faxed from the prosecutor's office to the offices of Iacona's lead defense counsel in November 1997. The Medina County Prosecuting Attorney testified that he was "100 percent positive" that the report had been faxed to defense counsel as part of a three-page transmission, because he was present at the time of faxing. He further testified that he had instructed a former law clerk to hand-deliver the report. The clerk testified that he had made the delivery to the offices of Iacona's lead trial counsel on or about November 17, 1997.

**{¶ 68}** The state also introduced testimony establishing that the Cuyahoga County Coroner's Office, which had conducted the autopsy of the child, had made the blood culture report available to the defense prior to trial. The Cuyahoga County Coroner testified that the report was in the file made available to defense experts during those experts' visits to the coroner's office, and that the report was part of "laboratory findings" included in receipts of those items given to the experts to review. An assistant coroner similarly testified that he was "absolutely sure" that the information that had been made available to the defense experts included the blood culture report.

**{¶ 69}** On the other hand, Iacona presented testimony to prove that the blood report had never been disclosed to the defense. Her lead defense counsel testified that he had never received the blood culture report, either via fax or hand delivery. Further, her experts claimed that they had not been given the report during their visits to the Cuyahoga County Coroner's Office.

**{¶ 70}** In the case at bar, after a recess following the quoted interchange between the prosecutor and Iacona's expert, defense counsel represented to the court that neither he nor his co-counsel had seen the blood culture report before. He told the court that he had, during the recess, asked his expert witness the significance of a positive finding for group A streptococcus in the report, and been informed that the expert considered streptococcus infection to be the presumptive cause of Baby Boy Iacona's death.

**{¶ 71}** The defense moved for a mistrial, which the trial court denied. The court instead indicated that it intended to give an opportunity to both the prosecution and the defense "to get the evidence out on this issue." Accordingly, the trial court permitted the defense to recall its expert for the purpose of disclosing to the jury his opinion, based on the newly discovered report, that the presumptive cause of Baby Boy Iacona's death was streptococcus infection. The court indicated that it would also allow the state to recall its own expert witnesses to testify as to

the significance of the report. The court further indicated that defense counsel could thereafter renew its motion for mistrial. The defense did not, however, move for a continuance. It renewed its motion for mistrial after its expert retestified, and the motion was denied. Ultimately, the defense offered State's Exhibit 77 into evidence, but the court refused to allow its admission.

1

*Denial of Motions for Mistrial*

**{¶ 72}** Iacona argues that the state violated the responsibilities imposed upon it not only by *Brady*, but also by Crim.R. 16. She contends that she was thereby deprived of a fair trial in the court of common pleas, and that the trial court's denial of her motions for mistrial made upon the defense's discovery of the possible import of the blood culture report late in the trial constituted reversible error.

**{¶ 73}** We note initially that the granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 382, 510 N.E.2d 343, 349-350. In addition, the trial court ultimately found that Iacona had not proven that the state failed to provide the blood culture report to the office of defense counsel prior to trial.

**{¶ 74}** Assuming, *arguendo*, that no disclosure of the blood culture report to the defense occurred *prior* to trial, it is clear that the defense became aware of its existence and possible significance *during* the trial. Strictly speaking, *Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence. *State v. Wickline* (1990), 50 Ohio St.3d 114, 116, 552 N.E.2d 913, 917. In such a circumstance a trial court has authority, pursuant to Crim.R. 16(E)(3), to grant a continuance or make other orders that the court deems just to ensure that the recently disclosed information can be evaluated, and used at defense counsel's option, before the trial is concluded.

**{¶ 75}** It has, however, been held that the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial. Even where information may be exculpatory, "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading & Paving, Inc.* (C.A.4, 1985), 760 F.2d 527, 532. See, also, *United States v. Starusko* (C.A.3, 1984), 729 F.2d 256, 262; *United States v. O'Keefe* (C.A.5, 1997), 128 F.3d 885, 898. We therefore analyze Iacona's contention of error in this context.

**{¶ 76}** Iacona argues that her defense team became aware of the blood culture report so late in the trial that a declaration of a mistrial was required. She claimed at the hearing on her motion for a new trial that her experts had already largely finished testifying by that time, that some of them no longer were available to be recalled, and that the entire trial strategy would have been different had they earlier recognized the significance of the report. All of these contentions could have been presented to the trial court in support of a motion for continuance, but were not.

**{¶ 77}** We do not go so far as to hold, based on the facts of this case, that failure to ask for a continuance during trial always results in a waiver of the right to assert an alleged *Brady* violation on appeal. Cf. *Yates v. Texas* (Tex.App.1997), 941 S.W.2d 357, 364. We do, however, reject Iacona's contention that she could not have made full and effective use of the blood culture report at this late stage of the trial had she sought and obtained a continuance and chosen to modify her defense strategy to emphasize the report. Cf. *State v. Wickline*, 50 Ohio St.3d at 116-117, 552 N.E.2d at 917. We note that the trial court found, in deciding Iacona's motion for new trial, that defense counsel had made a strategic decision not to pursue the theory that death was caused by bacterial infection.

**{¶ 78}** Therefore, even assuming *arguendo* that Iacona's defense counsel was not provided a copy of the blood culture report until it was disclosed by the prosecutor during the cross-examination of her expert witness, her contention that the trial court abused its discretion in failing to grant her motions for mistrial is unfounded.

2

*Failure of State to Prove Receipt of Report*

**{¶ 79}** Iacona argues that, even if the prosecutor did fax and hand-deliver the report in a timely manner, a *Brady* violation nonetheless exists because the state failed to ensure actual receipt of the disclosed material.

**{¶ 80}** Iacona cites only one case, *In re Brown* (1998), 17 Cal.4th 873, 72 Cal.Rptr.2d 698, 952 P.2d 715, in support of her contention that "the duty imposed by *Brady* is not fulfilled if the prosecutor *provides* a piece of discovery, but it is never actually received." (Emphasis *sic*.) This case is factually distinguishable. In *Brown* the state conceded that it had never delivered a potentially exculpatory piece of evidence to the defense. *Id*. at 883, 72 Cal.Rptr.2d at 704, 952 P.2d at 721.

**{¶ 81}** We reject Iacona's argument that the state was required not only to introduce evidence that it *provided* the blood culture report to the defense, but also was required to disprove the contention of the defense team that they did not *receive* it. We find instead that Iacona's defense team is charged with constructive receipt of documents delivered to the office of defense counsel even if those documents did not reach the lawyers or experts who were best able to make use of them.

**{¶ 82}** Further, in ruling on Iacona's motion for new trial, the trial court ultimately concluded that it was the defense's burden to show a *Brady* violation and that the defense was unable to disprove the prosecution's evidence that a copy of the report had been delivered to the defense. It is implicit in that conclusion that the trial court found it to be fact, for legal purposes, that the defense indeed received the report, even if the defense did not recognize the report's significance.

**{¶ 83}** Moreover, it is well established that the state has no duty to explain the significance of disclosed evidence. In *State v. Parker* (1990), 53 Ohio St.3d 82, 558 N.E.2d 1164, paragraph one of the syllabus, this court held:

**{¶ 84}** "Crim.R. 16(B) does not require the prosecution to disclose to the defendant the significance to the prosecution of information sought to be discovered by the defendant. The rule only requires the prosecution to disclose, and to permit the defendant to obtain, the information sought."

**{¶ 85}** Thus, the state is under no obligation to explain the potential importance of disclosed *Brady* information. See, also, *United States v. Aubin* (C.A.5, 1996), 87 F.3d 141, 148-149.

3

*Alleged Misleading Conduct of the Prosecution Regarding Blood Culture Report*

**{¶ 86}** In this portion of her argument Iacona accepts the proposition, *arguendo*, that the prosecution disclosed the blood culture report to the defense, but contends that it used trickery to induce the defense to ignore it. She directs this court to a number of cases that stand for the proposition that the state cannot actively mislead a defendant into thinking that favorable evidence is not favorable.

**{¶ 87}** In every case cited by Iacona, however, the prosecution, in disclosing an item of evidence to the defense, either affirmatively told the defense that the evidence was of no value or actively misled the defense about the nature of the evidence so as to trick the defense into dismissing it as useless. See, *e.g.*, *United States v. Shaffer* (C.A.9, 1986), 789 F.2d 682, 690; *United States v. Anzeulotto* (Jan. 19, 1996), E.D.N.Y. No. 93 Cr 1316(FB), unreported, 1996 WL 31233. We do not find active misdirection of this nature in the case at bar.

**{¶ 88}** Iacona claims that, even if the state did provide the blood culture report before trial by fax and hand delivery, the manner of production described by its witnesses indicates that the state intended to conceal the nature and significance of the report. She first asserts that the fax copy allegedly sent to her counsel was

so blurry that it was difficult to read, and that the law clerk who testified that he had hand-delivered a copy said it wasn't legible. Iacona further complains that the cover sheet accompanying the report was incorrect and made no mention of a blood culture, instead describing it as "supplemental discovery" of the name of an additional state witness.

{¶ 89} We do not equate production of a less-than-perfect copy of a report with prejudicial misdirection. Nor do we believe it is unduly burdensome to expect the recipient of an unclear electronic copy to request a clearer copy.

{¶ 90} Moreover, to accept Iacona's argument, we would be required to discount as untruthful the consistent testimony of the state's witnesses, including the prosecutor himself and members of his staff, that they believed the blood culture report to be medically insignificant. Rather, Iacona asks us to believe that the state knew the blood culture report to be of such overwhelming significance that it improperly and consciously tried to hide its import while ostensibly disclosing it. The evidence does not support this conclusion.

{¶ 91} Nor do we believe that the defense is relieved of the duty, in due diligence, to review evidence disclosed by the state, to determine for itself its significance. We believe that this duty exists even where the state includes a cover page describing, in summary manner, one of the items produced and which expresses no opinion as to the significance of the item or items accompanying the cover page.

{¶ 92} We do not find the state's actions in the case at bar analogous to the affirmatively misleading conduct by the prosecution described in the cases cited by Iacona, or otherwise find the described conduct to rise to the level of prosecutorial misconduct or deprivation of due process. We therefore reject this portion of her argument.

4

*Alleged Intentional Use of False or Misleading Testimony*

{¶ 93} Iacona argues that, irrespective of the timing of disclosure of the report to the defense, the state knowingly used false and misleading testimony at trial regarding the existence of the blood culture. In support of her argument, Iacona directs us to the trial testimony of several witnesses for the state.

{¶ 94} Dr. Rolf, for instance testified that she had found no evidence of infection in Baby Boy Iacona other than a inflammation of placental membranes attached to the umbilical cord and that she found no natural cause or disease that would cause death immediately after delivery. She further testified that there was some blood in the heart, but not enough to run some tests that were earlier mentioned in her testimony. She testified that she "didn't see any evidence of infection" in the baby.

{¶ 95} Dr. Challener, Dr. Rolf's supervisor at the Cuyahoga County Coroner's Office, testified that "examination of the tissues of the baby, including the umbilical cord, showed no evidence whatsoever of inflammation or infection."

{¶ 96} Iacona argues that "even if the state's witnesses genuinely believed the positive blood culture should be discounted as the product of contamination, testimonial candor required them to state that, yes, there was a 'sign' or 'some evidence' of infection in the baby, but that this evidence should be discounted for whatever reason the state wished to advance." The question we must answer is whether such a failure of "testimonial candor" rises to the level of a due process violation when left uncorrected by the state.

{¶ 97} In support of its argument Iacona directs our attention to *State v. Staten* (1984), 14 Ohio App.3d 78, 14 OBR 91, 470 N.E.2d 249, in which the court held that a prosecutor's duty of assuring that a criminal defendant receives a fair trial includes an obligation to (1) refrain from knowingly using perjured testimony, (2) disclose evidence favorable to the accused, and (3) correct testimony he knows to be false. *Id*. at paragraph one of the syllabus. However, *Staten* further held that, in such situations, the issue devolves into an inquiry as to whether a failure to

correct misleading testimony rises to the level of prosecutorial misconduct so as to deprive a defendant of due process. "The appropriate standard of review therefore is to determine * * * whether the prosecutor's misconduct may have been so egregious so as to deny [the defendant] the fundamental right to a fair trial." *Id*. at 85, 14 OBR at 98, 470 N.E.2d at 256-257.

{¶ 98} Here the record supports the prosecutor's protestations that he believed both that the defense was in possession of the blood culture report and that it was scientifically insignificant. Indeed, at least two doctors specifically told the prosecutor or his staff prior to trial that the blood culture report was not significant and that the positive finding of streptococcus almost certainly resulted from contamination of the blood sample during the autopsy. Based on the information the prosecutor had at the time of trial, whether accurate or inaccurate, the prosecutor was entitled to expect that any deficiencies in his experts' reasoning would be raised by the defense during cross-examination. His silence in the face of the expert testimony cited by Iacona simply does not rise to a level of egregious misconduct sufficient to support a finding of a deprivation of due process.

{¶ 99} We therefore reject Iacona's argument concerning presentation of allegedly false testimony.

B

*Ineffective Assistance of Counsel*

**{¶ 100}** Iacona argues that even if the blood culture report had been produced prior to trial, her trial counsel were ineffective because they failed to provide the report to her experts and pursue a defense based on the presence of group A streptococcus.

**{¶ 101}** We explained the test for ineffective assistance of counsel in *State v. Bradley* (1989), 42 Ohio St.3d 136, 142, 538 N.E.2d 373, 379-380. Referring to the seminal case of *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, we stated:

"[T]he *Strickland* court set forth the standards to be used in determining whether counsel has been ineffective and whether a criminal defendant has been prejudiced thereby. As for ineffectiveness, '[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.' *Strickland*, *supra*, at 687-688 [104 S.Ct. at 2064, 80 L.Ed.2d at 693]. The court recognized that there are '* * * countless ways to provide effective assistance in any given case. * * *' *Id*. at 689 [104 S.Ct. at 2065, 80 L.Ed.2d at 695]. Therefore, the court stated that '[j]udicial scrutiny of counsel's performance must be highly deferential. * * *' *Id*. [at 688-690, 104 S.Ct. at 2065, 80 L.Ed.2d at 694]. In addition, '[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.' *Id*. [at 688-690, 104 S.Ct. at 2065, 80 L.Ed.2d at 694]. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance."

{¶ 102} Iacona argues that, assuming the report was timely disclosed, she was deprived of effective assistance of counsel because both her lawyers, and the experts procured by her lawyers, missed the reference to group A streptococcus, or missed its significance, in the blood culture report. We find that these assertions, even if true, do not demonstrate ineffective assistance of trial counsel.

{¶ 103} Iacona has failed to meet her burden in proving that trial counsel fell below the wide range of what constitutes reasonable professional assistance. Her narrow focus ignores the fuller context of her counsel's performance. To prove ineffective assistance, Iacona must prove that counsel's performance does not fall within one of the " 'countless ways to provide effective assistance.' " *Bradley*, 42 Ohio St.3d at 142, 538 N.E.2d at 379, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 695. While defense counsel's failure to deliver the culture report to the defense experts, standing alone, may have constituted deficient performance, that is not the only relevant conduct here. Rather, the dispositive conduct in regard to Iacona's ineffective assistance claim is that Iacona's trial counsel caused her experts to review the coroner's original autopsy files. Defense counsel not only arranged for Iacona's experts to review the coroner's autopsy materials, but even transported the experts to the coroner's office.

{¶ 104} As noted, the parties dispute whether the blood culture report was part of the coroner's file; each side presented contrary testimony. If the coroner's files indeed included the report, any deficiency on the part of Iacona's counsel in delivering a copy of that report to its experts was remedied. In such a factual circumstance, defense counsel were not ineffective because Iacona's experts failed to review the report or recognize its potential import.

{¶ 105} Further, for the limited purpose of addressing appellant's claim of ineffective assistance of counsel, it does not matter whether the blood culture report was, in fact, contained within the coroner's files. In assuring that its experts reviewed the original files at the coroner's office, defense counsel acted reasonably

to assure that all relevant medical and scientific information within the possession of the state was available to defense experts. If the report was not actually in the file at the coroner's office, the error of the state can hardly be attributed to defense counsel.

{¶ 106} We find counsel's conduct to be within the wide range of reasonable professional assistance. Because Iacona has failed to satisfy the first prong of *Strickland*, her ineffective assistance of counsel claim fails.

C

*Due Process—Presentation of Witness Out of Order*

{¶ 107} Iacona argues that she was deprived of due process when the trial court permitted the prosecution to recall an expert out of order during the defense case-in-chief.

{¶ 108} The record reflects that after its expert first disclosed that the laboratory blood culture report might have significant evidentiary value, it was the *defense* that sought to alter the general order of presentation of evidence by asking the court for permission to recall that expert after his earlier dismissal. The court indicated that it would allow state's expert Dr. Challener to testify, and be cross-examined, regarding the significance, or lack of significance, of the report. If the defense then wished to recall their expert, the court stated that it would permit it. The trial, in fact, proceeded accordingly.

{¶ 109} We find no abuse of the court's wide discretion in exercising control over the order of the presentation of witnesses.

D

*Due Process—Alleged Impropriety Regarding Probable Evidentiary Rulings*

{¶ 110} Iacona further claims that the trial court abused its discretion and deprived her of due process by threatening her counsel into forgoing a natural-cause-of-death defense. She contends that the trial court informed her counsel, off the record, that if the defense were to pursue a sepsis theory of cause of death based

on the blood culture report, the court would allow the prosecution to present evidence that Baby Boy Iacona's premature birth was caused by defendant's use of cocaine during her pregnancy.

{¶ 111} The visiting judge assigned to hear the motion for a new trial referred to this discussion in concluding that Iacona's "[t]rial counsel made a reasoned decision to forego [*sic*] evidence of sepsis being the cause of death given the trial court's caution that, in such an event, the prosecution would be permitted to introduce evidence of defendant's behavior during pregnancy (*i.e.*, use of alcohol, cocaine, tanning, etc.)."

{¶ 112} But, as recognized by the court of appeals, which found itself unable to address the merits of the alleged error in the absence of an App.R. 9(C) statement, we do not have the actual discussion between the court and counsel before us in the transcribed proceedings. This court declines to find an abuse of trial court discretion based on undeveloped accounts of its actions as filtered through parties' perceptions.

{¶ 113} Moreover, we take issue with Iacona's characterization of the facts it proffers as demonstrating a trial court "threat." We do not believe it to be uncommon for a trial court to informally advise counsel as to probable rulings in the event of hypothetical motions. Such predictions are not improper where, as here, those evidentiary rulings appear to fall within the range of a sound exercise of discretion as to the admissibility of evidence.

E

*Sentencing*

{¶ 114} The court of appeals found that the trial court erred in sentencing Iacona, a first offender, to more than the shortest prison term authorized by law without stating on the record that "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." See R.C. 2929.14(B) and *State v.*

*Edmonson* (1999), 86 Ohio St.3d 324, 715 N.E.2d 131. Iacona claims that the trial court evinced bias against her in comments made during sentencing and that the court of appeals was required to itself impose a minimum term of imprisonment, rather than remanding the cause to the trial court. Alternatively, she contends that the court of appeals, if not required to impose the minimum sentence, should have either elected to do so or directed the trial court to do so on remand.

{¶ 115} We reject this argument. A court of appeals hearing an appeal of sentencing "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing" if the court clearly and convincingly finds that the sentence is contrary to law. R.C. 2953.08(G)(2)(b). This statutory language clearly vests the court of appeals with discretion in determining whether to resentence the defendant or remand to the trial court for resentencing. Iacona has failed to demonstrate that the court of appeals abused its discretion by remanding to the trial court for sentencing, an action we approved in *Edmonson*.

V

{¶ 116} For the foregoing reasons, the judgment of the court of appeals is affirmed. Upon remand, the trial court shall resentence Iacona in accordance with the mandate of the court of appeals.

*Judgment affirmed.*

RESNICK and F.E. SWEENEY, JJ., concur.

DOUGLAS, PFEIFER and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

COOK, J., concurs in judgment only.

––––––––––––––––––

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 117} I agree and concur with Justice Lundberg Stratton in her discussion and conclusions with regard to the charges of involuntary manslaughter and abuse of a corpse. I do not agree that the charge and resulting conviction for child endangering should stand. If, in fact, there was a streptococcus infection in the baby at birth, then the evidence tends to show that such deadly bacterium could bring about death within a few minutes of birth. If this is so then it is difficult for me to see how the defendant can be charged with "child endangering" as we today understand that charge.

_____

**LUNDBERG STRATTON, J., concurring in part and dissenting in part.**

{¶ 118} I concur with the syllabus paragraphs of the majority opinion, and I would affirm the convictions for endangering a child and abuse of a corpse. However, for the reasons set forth below, I would reverse the convictions for involuntary manslaughter and grant a new trial.

{¶ 119} This case presents difficult issues of who sent, received and/or used an important blood culture report. I concur with the majority that the blood culture report would not have affected the outcome of the juvenile bindover proceedings because there was sufficient other evidence to establish probable cause.

{¶ 120} However, I believe that Exhibit 77, the blood culture report, was material evidence that the defense should have been able to present to the *jury*. The report showed certain streptococcus bacteria in the baby's blood that would indicate the presence of infection. This was crucial evidence for the defense. Had it been presented to the jury and had the jury believed the testimony of the defense experts, the report could have altered the outcome of the trial and the verdict on involuntary manslaughter by introducing reasonable doubt. Consequently, I would reverse and remand this case for a new trial on the charge of involuntary manslaughter.

{¶ 121} Both sides presented conflicting evidence at the hearing on the defense motion for new trial. Expert witnesses on behalf of the defense testified that the positive blood culture reflected a streptococcus infection present in the baby that was not the result of a contaminated culture. Defense experts testified that streptococcus is a deadly bacterium that can cause death within minutes after entering the bloodstream and a premature baby with such an infection in the blood at birth likely would not have survived without immediate medical attention.

{¶ 122} On the other hand, the state's experts testified that the blood was contaminated postmortem and that the culture was not true evidence of an infection in the baby. There was evidence that the baby was born alive and was able to breathe for a few minutes. Autopsy results indicated the presence of air in the baby's lungs, stomach and small intestines. In addition, there was no evidence of infection in the baby's tissue.

{¶ 123} The expert witnesses were divided and there was evidence to support both sides of the issue. Therefore, I believe that this should have been a question for the jury to decide. I believe that this testimony establishes a reasonable probability that the outcome of the trial regarding the convictions for involuntary manslaughter could have been different had the jury been permitted to hear such evidence and believed the defense experts. On that basis, I would reverse the convictions for involuntary manslaughter and grant a new trial.

{¶ 124} Regarding the dispute over whether defense counsel received a copy of the blood culture report, defense counsel and defense expert witnesses testified that they had no knowledge of the blood culture report until late in the trial during Dr. Meadow's cross-examination. Witnesses for the prosecution testified that the report had been provided to the defense and was also available for review at the Cuyahoga County Coroner's Office. The trial court determined that both sides presented evidence of "equal weight" concerning the disclosure or nondisclosure of the report. There is no indication whether the court *believed* one

side over the other. Yet the court placed the burden upon the defense to prove that it did *not* receive a copy of the report. Other than of the testimony of original trial counsel, I fail to see how the defense could meet such a burden of proving a negative, that it did not receive a copy of the report. Crim.R. 16 places the duty upon the state to disclose exculpatory evidence. The report was clearly *Brady* material. I believe that the trial court improperly placed the burden upon the defense in this instance to prove that it did not receive the report instead of requiring the state to prove that it produced the report.

**{¶ 125}** Finally, if one assumes that defense counsel *did* receive a copy of the blood culture report, then I would find that counsel failed to effectively utilize it. Defense counsel failed to glean its significance and develop a defense theory based upon a cause of death that was not homicide. There was testimony at the hearing on the motion for a new trial that this evidence could have been the basis for a crucial defense, and at a minimum it was a question for the jury. Had counsel developed a theory based upon an alternate cause of death, I believe that there was a reasonable probability that the outcome of the proceedings could have been different.

**{¶ 126}** However, defense counsel did not even discuss the report with defense experts. Counsel claim that this is because they were unaware of the report. But if one were to believe that the failure to use the report was a deliberate choice, this decision cannot be swept aside merely as a strategic decision. The existence of a positive blood culture was material and defense counsel's failure to use this evidence, if actually received, undermined confidence in the trial's outcome and prejudiced the defendant. I disagree with the majority that, upon discovering the blood culture report midtrial, defense counsel could have sought a continuance. To create an effective defense based upon the report, reference to the report would have permeated the entire aspect of the defense case beginning with voir dire. I do not believe that a continuance upon late discovery would have been sufficient to

cure the defect. Consequently, I would reverse the convictions for involuntary manslaughter and grant a new trial.

{¶ 127} As for the convictions for child endangering and abuse of a corpse, I would affirm the judgment of the court of appeals. Had the defendant notified someone once she went into labor and had gone to a hospital, the outcome may have been different even if the streptococcus infection was present. By choosing to deliver the baby alone in a basement, the defendant sealed the child's fate at that time. The acts of covering the baby with a towel, wrapping it in plastic bags, then hiding it in the basement certainly constitute sufficient evidence of abuse of a corpse.

{¶ 128} Therefore, I concur with the judgment of the court of appeals in affirming the convictions for endangering a child and abuse of a corpse. However, I would reverse the convictions for involuntary manslaughter and remand for retrial.

DOUGLAS and PFEIFER, JJ., concur in the foregoing opinion.

_____

*Dean Holman*, Medina County Prosecuting Attorney, and *Joseph F. Salzgeber*, Assistant Prosecuting Attorney, for appellee.

*Gold & Schwartz Co., L.P.A., Niki Z. Schwartz* and *Orville E. Stifel II*, for appellant.

_____