[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Brown,* Slip Opinion No. 2024-Ohio-749.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-749

THE STATE OF OHIO, APPELLANT *v.* BROWN, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Brown,* Slip Opinion No. 2024-Ohio-749.]**

*Criminal law—Robbery—Court of appeals erred in determining that evidence was insufficient to support trial court's conclusion that appellee committed a theft offense and that in doing so, he threatened to inflict physical harm on two different people—R.C. 2911.02(A) (defining robbery as threatening to inflict physical harm on another while committing a theft offense) does not require that theft victim be person who was threatened—A defendant may not assert error on appeal based on late disclosure of evidence alleged to be materially exculpatory that was not disclosed until trial unless defendant raised the issue in trial court by requesting continuance or mistrial or by some other means— Appellee forfeited claim that he was entitled to new trial based on state's purported violation of* Brown v. Maryland—*Court of appeals' judgment reversed and cause remanded for court of appeals to consider appellee's remaining assignments of error.*

(No. 2022-1182—Submitted September 12, 2023—Decided March 5, 2024.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-210355, 2022-Ohio-2752.

_____

**DEWINE, J.**

{¶ 1} A woman arranged to buy a car on a social-media app. She took a friend with her to meet the seller. The meeting was a setup. When the purported seller arrived, the buyer handed her friend the money to hold. The seller pulled a gun and demanded that the buyer's friend hand over the money. She did.

{¶ 2} The perpetrator was arrested and ultimately convicted of robbing both women and illegally having a gun. But the First District Court of Appeals overturned the convictions. 2022-Ohio-2752, 198 N.E.3d 111, ¶ 70. It held that the defendant could not be convicted of robbing the buyer because she was not the one holding the money. *See id.* at ¶ 54. And it determined that the state had violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by using information at trial that had not previously been disclosed to the defense, even though the defendant did not object to the use of that information at trial. *See* 2022-Ohio-2752 at ¶ 58-68.

{¶ 3} We reverse the judgment of the First District and remand the case for further review in that court. Under the plain terms of the robbery statute, the defendant was properly convicted of robbing both women. And there was no *Brady* violation because the information was disclosed at trial and the defense did not move for a continuance or mistrial, or otherwise object to the use of the information.

## I. A Car Deal Turns Out to Be a Setup

{¶ 4} Holly Smothers arranged to buy a Toyota Corolla for $600 through Letgo, an online app. The seller was identified on the app as Danny Buckley. When it came time to meet the seller, Smothers took her boyfriend's aunt, Sharlene Johnson Bryant, with her.

{¶ 5} Bryant was familiar with the area where the deal was to take place, and she gave Smothers a ride there. When the two arrived, Smothers called the seller, and he redirected the women to a nearby street. There, a man waved the women down and walked up to the passenger side of the car. The man told Smothers that he was going to get the Corolla to show her. Smothers handed Bryant the money, asking her to hold it while she went to look at the Corolla. As Smothers was getting out of Bryant's car, the man drew a gun, and he demanded that Bryant hand over the $600. Smothers was standing right next to the man as he pointed his gun at Bryant. Bryant did what she was told, and the man fled with the money.

{¶ 6} The women called the police. When they arrived at the scene, the women described the robber as a black man, around 5'5", and approximately 120 pounds. They said that he was wearing a skull cap, shirt, and shorts.

{¶ 7} The next day, Smothers went to the Letgo app and found the email address connected with the Danny Buckley Letgo account. She then found a Facebook account associated with the same email address. The Facebook account was under the name Rickey Tan.

{¶ 8} Smothers sent the Facebook information and photographs from the Facebook account to the case detective. She also showed the Facebook photos to Bryant. From the Facebook information and photos, the police department's intelligence unit was able to identify the man as Rickey Brown.

{¶ 9} The police department arranged for two photo lineups to be prepared and for the victims each to separately review the lineups. Each lineup included a photo of Brown, though one different from the ones that Smothers had found on Facebook. A "blind administrator," who knew nothing about the case, administered the lineups. Each victim identified Brown. Bryant said that she was positive about her identification because of his facial features. Similarly, Smothers said that she was 99 percent certain about her identification.

{¶ 10} For each victim, Brown was indicted on one count of robbery under

R.C. 2911.02(A)(2) and one count of aggravated robbery under R.C. 2911.01(A)(1). He was also indicted for having a weapon while under a disability. Brown waived his right to a jury trial, and the court conducted a bench trial.

{¶ 11} The Facebook photos were disclosed during discovery, but the way they were obtained was not. Although the police knew about Smothers's independent investigation prior to trial, the prosecutors handling the case apparently did not learn until trial that Smothers had provided the Facebook photos to the police.

{¶ 12} Smothers's detective work came out during the state's direct examination of her. Instead of moving for a mistrial or requesting a continuance, Brown's attorney chose to use Smothers's sleuthing to attempt to discredit the victims' identifications and the police investigation. For example, the attorney had the following exchange with Smothers:

> Q. Ms. Smothers, you did your own investigation to try to find those photographs, didn't you?
> A. Yes.
> Q. So you went into the Letgo App—
> A. Yes.
> Q. —and you searched around the Letgo App?
> A. Only in where I text him at.
> Q. And * * * you started * * * [c]licking on links within the Letgo App?
> A. No. There's—you—there's links in the Letgo App, but when you go to purchase something, you can go into that person's—that person—whatever they posted, you can actually go and see their information, their Gmail and everything—
> * * *

4

Q. And so, you actually went and found those pictures before you went to the police station, didn't you?

A. Yeah. I believe so. I think. I don't—really don't remember. It's been a year ago.

Q. Okay. But you had those pictures before you went to the police station?

A. Yes.

Q. And you showed those pictures to Ms. [Bryant]?

A. Yes.

Q. And you showed those pictures to her before you both went to the police station?

A. Hmm, yes. * * *

In cross-examining Smothers, Brown's attorney also made the point that even if Brown's email address was associated with the Letgo account, that did not necessarily establish that Brown was the user of that account.

{¶ 13} Brown's attorney similarly cross-examined Bryant about her having reviewed a Facebook photo of Brown prior to the lineup administered by the police department. And she cross-examined the department's case detective about relying on the Facebook information obtained from Smothers and failing to conduct a more thorough investigation of his own.

{¶ 14} The trial court found Brown guilty of the aggravated robbery of Bryant as well as an accompanying firearm specification, the robbery of Smothers, and the weapons-under-disability charge. It acquitted Brown on the remaining counts. About two weeks later, Brown filed a motion for a new trial. The motion asserted that the state violated *Brady* by not disclosing that Smothers had conducted her own investigation and by not revealing that both Smothers and Bryant had viewed the Facebook photos prior to the photo lineups.

{¶ 15} The trial court denied Brown's new-trial motion. It explained that defense counsel conducted a "rigorous cross-examination [about the way the police obtained the Facebook photos] with the witnesses while on the stand. And [defense counsel] did a very good job at cross-examining witnesses." Thus, the court concluded that earlier disclosure of this information would not "have resulted in a different verdict or outcome."

{¶ 16} Brown appealed to the First District, arguing, among other things, that the state failed to present sufficient evidence supporting his conviction for the robbery of Smothers and that the trial court erred in failing to grant his motion for a new trial. The First District, in a 2-to-1 decision, overturned all three of Brown's convictions. The majority first explained that it was reversing Brown's conviction for robbing Smothers on the basis that he did not take money directly from Smothers:

> [W]hen no property is taken from a person, a threat of harm used against that person does not establish a robbery.
> * * *
> Here, the evidence established that Brown took $600 from [Bryant] while pointing a gun at her. Although Smothers saw the weapon, and the gun was brandished in close proximity to her, no evidence was presented that Smothers relinquished the money due to the threat of harm. While the money may have belonged to Smothers, the money was taken from [Bryant] under the threat of harm.

(Citations omitted.) 2022-Ohio-2752, 198 N.E.3d 111, at ¶ 53-54.

{¶ 17} The First District then explained that it was reversing Brown's other two convictions based on a purported *Brady* violation. *Id.* at ¶ 67, 69-70. The

majority opined that its "confidence in the trial court's verdict [had been] undermined" because "[h]ad the state disclosed Smother[s's] investigation leading to her identification of Brown as the robber, Brown would have had an opportunity to challenge both the alleged link to his Facebook page and the reliability of the identification." *Id.* at ¶ 67.

{¶ 18} Because the reversal of the conviction for robbing Smothers was based on a finding of insufficient evidence, the court of appeals discharged Brown from future prosecution on that charge. *Id.* at ¶ 70. The court remanded the case for a new trial on the remaining charges. *Id.* The court determined that its remand for a new trial rendered moot Brown's remaining assignments of error in which he asserted he was improperly handcuffed during trial, he received ineffective assistance of counsel, and his convictions were against the manifest weight of the evidence. *See id.* at ¶ 69.

## II. We Reverse the Court of Appeals

{¶ 19} We accepted the state's appeal on two propositions of law. In the first, it challenges the trial court's reversal for lack of sufficient evidence of Brown's conviction for robbing Smothers. In the second proposition, the state takes issue with the trial court's decision to grant a new trial on the remaining charges based on a purported *Brady* violation.

### A. The State Presented Sufficient Evidence to Convict Brown of Robbing Smothers

{¶ 20} The court of appeals reversed Brown's conviction for the robbery of Smothers because it concluded that the state had failed to present sufficient evidence of the elements of the crime. *See id.*, 2022-Ohio-2752, 198 N.E.3d 111, at ¶ 54. A reversal for evidentiary insufficiency is proper only when "the evidence presented, when viewed in a light most favorable to the prosecution," would not allow "any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, 170

N.E.3d 813, ¶ 7.

{¶ 21} Brown was convicted of robbing Smothers under R.C. 2911.02(A)(2). That provision provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another."

{¶ 22} The First District's reversal of the robbery conviction was based on two conclusions by the court. First, it assumed that because Smothers had voluntarily handed her money to Bryant, Smothers was not a victim of a theft offense. *See* 2022-Ohio-2752 at ¶ 54. And second, it concluded as a matter of law that a conviction under R.C. 2911.02(A)(2) requires the person threatened and the victim of the theft to be the same person. *See id.* The court was wrong on both points.

{¶ 23} We start with the First District's reading of the statute. By its plain terms, R.C. 2911.02(A) requires only that in committing a theft offense, a person threatened to inflict physical harm on another. There is no requirement in the statute that the theft victim be the same person who was threatened. Quite simply, the court of appeals' gloss on the statute is unsupported by the statutory language.

{¶ 24} Indeed, the robbery statute criminalizes a threat of physical harm made either during a theft offense or "in fleeing immediately after the attempt or offense." R.C. 2911.02(A)(2). In a scenario where a perpetrator flees after committing a theft, the victim of the threat will likely be a different person from the victim of the theft.

{¶ 25} We note further that even if the statute did require that the person threatened be the victim of the theft (though it clearly does not), there is no basis for the First District's assumption that Smothers was not a victim of the theft. As the dissenting judge explained, "Smothers was the owner of the stolen cash, Brown's intended target, and also in close proximity to Brown when he brandished

a gun." 2022-Ohio-2752, 198 N.E.3d 111, at ¶ 75 (Winkler, J., dissenting). Plainly, Smothers was the victim of a theft offense. *See* R.C. 2913.01(K)(1) (defining "theft offense" as including a violation of R.C. 2913.02) and 2913.02(A)(1) ("No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [w]ithout the consent of the owner or person authorized to give consent").

{¶ 26} Although the court of appeals assumed that Brown threatened both women by brandishing his weapon, Brown now argues that he did not threaten Smothers because he pointed the gun only at Bryant. But we have held that " 'the threat of physical harm need not be explicit; rather, an implied threat of physical harm is sufficient to support a conviction under R.C. 2911.02(A)(2).' " *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 23, quoting *State v. Harris*, Franklin App. No. 07AP-137, 2008-Ohio-27, ¶ 14 (10th Dist.). We have further explained that "[o]ne cannot display, brandish, indicate possession of, or use a deadly weapon in the context of committing a theft offense without conveying an implied threat to inflict physical harm." *Id.*

{¶ 27} Smothers wasn't a bystander; she was a part of every aspect of the two women's interaction with Brown. She arranged the car purchase, it was her money that was stolen, and she was next to Brown when he pointed a gun at Bryant. By brandishing a weapon to steal money that belonged to Smothers, Brown implicitly threatened physical harm to Smothers even though the gun was pointed at Bryant.

{¶ 28} The evidence presented was sufficient for the trial court to conclude that Brown committed a theft offense and that in doing so, he "threaten[ed] to inflict physical harm" on two different people, one being Smothers. The court of appeals erred in holding otherwise.

### B. Brown Forfeited Any Brady Claim

{¶ 29} The state's second proposition of law takes issue with the First

District's conclusion that Brown was entitled to a new trial based on a purported *Brady* violation. In Brown's motion for a new trial, he claimed that not learning about Smothers's independent investigation until trial prevented him from moving to suppress the photo-lineup identifications based on the witnesses' prior exposure to the Facebook photos—though he did not explain why he believed such a motion would have been successful. He also argued that having this information before trial would have allowed him to present expert testimony on "how irreparable misidentifications occur." On appeal, he now also claims that more time would have allowed him to research the Letgo app and potentially show the "concocted linkage testimony" to be false by looking "into whether the Letgo app could be traced to the Facebook or Google account used to initiate the Letgo app."

{¶ 30} In *Brady*, the United States Supreme Court held that a state violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution by suppressing evidence favorable to the accused where the evidence is material to guilt. 373 U.S. at 87, 93 S.Ct. 1194, 10 L.Ed.2d 215. To establish a *Brady* violation, a defendant must demonstrate (1) that the evidence is favorable to the defendant, because it is either exculpatory or impeaching, (2) that the evidence was willfully or inadvertently suppressed by the state, and (3) that the defendant was prejudiced as a result. *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Evidence is material—or prejudicial—" 'when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' " *Turner v. United States*, 582 U.S. 313, 324, 137 S.Ct. 1885, 198 L.Ed.2d 443 (2017), quoting *Cone v. Bell*, 556 U.S. 449, 469-470, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009).

{¶ 31} *Brady* applies to the "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Thus, "[s]trictly speaking, *Brady* is not violated when disclosure occurs during trial, even when

disclosure surprises the defendant with previously undisclosed evidence." *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001) (lead opinion). Nonetheless, three justices in *Iacona* suggested that "the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial." *Id*. The lead opinion then went on to analyze the defendant's contention that the trial court erred by failing to grant her motion for a mistrial "in this context." *Id*.

{¶ 32} We need not decide here whether a *Brady* violation is ever properly grounded in evidence that is disclosed during trial, because we determine that under the facts of this case, Brown forfeited any *Brady* claim.[1]

{¶ 33} In *Iacona*, this court upheld the trial court's decision to deny the defense motion for a mistrial based on the state's alleged failure to disclose certain evidence before trial. *Iacona* at 101. In doing so, the lead opinion noted that when evidence is disclosed during trial, "a trial court has authority, pursuant to [the Rules of Criminal Procedure], to grant a continuance or make other orders that the court deems just to ensure that the recently disclosed information can be evaluated, and used at defense counsel's option, before the trial is concluded." *Id*. at 100.

{¶ 34} The lead opinion in *Iacona* did not "go so far as to hold, based on the facts of [that] case, that failure to ask for a continuance during trial always results in a waiver of the right to assert an alleged *Brady* violation on appeal." *Id*. at 101. But it did reject the defendant's "contention that she could not have made full and effective use of the [late-disclosed evidence] had she sought and obtained

---

1. Brown contends that the state waived its argument that there is no *Brady* violation when evidence is disclosed at trial and the defense fails to request a continuance by failing to present this argument in its briefs in the court of appeals. But in his First District brief, Brown conceded that there was no *Brady* violation. Further, the state in its First District brief argued that "Brown's trial counsel was afforded the opportunity to thoroughly cross-examine each of the witnesses about the Facebook photographs and to argue how those photographs may have influenced the identification of Brown." Thus, we reject Brown's waiver arguments.

a continuance and chosen to modify her defense strategy to emphasize the [evidence]." *Id.*

{¶ 35} This case is different from *Iacona*. Brown not only did not ask for a continuance, but (unlike the defendant in *Iacona*) he did not request a mistrial either. "A first principle of appellate jurisdiction is that a party ordinarily may not present an argument on appeal that it failed to raise below." *State v. Wintermeyer*, 158 Ohio St.3d 513, 2019-Ohio-5156, 145 N.E.3d 278, ¶ 10; *see also State v. Glaros*, 170 Ohio St. 471, 166 N.E.2d 379 (1960), paragraph one of the syllabus ("It is a general rule that an appellate court will not consider any error which counsel * * * could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court"). Absent such a requirement, counsel would be able "to place his client in a position where he could take advantage of a favorable verdict and, at the same time, avoid an unfavorable verdict merely because of an error of the trial judge that counsel made no effort to prevent * * * when such error could have been avoided." *Glaros* at 475.

{¶ 36} Trial judges have considerable tools available to handle discovery violations, including the granting of continuances and mistrials. *See* Crim.R. 16(L)(1) ("If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with [Crim.R. 16 (Discovery and inspection)] or with an order issued pursuant to [that] rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances"); *see also State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 89, quoting *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995) ("The decision whether to grant or deny a mistrial 'lies within the sound discretion of the trial court' "). But these tools are to no avail unless claims of error are raised at the trial level. Thus, we hold today that a defendant may not assert error on appeal based on the late

disclosure of evidence alleged to be materially exculpatory that is not disclosed until trial unless the defendant has raised the issue in the trial court by asking for a continuance or a mistrial, or by some other means.

{¶ 37} Brown did not ask for a continuance or a mistrial at any time during the trial. Instead, once Smothers's independent investigation was revealed at trial, Brown chose to use that information at trial to attempt to discredit the reliability of the victims' photo-lineup identifications and the thoroughness of the police investigation. "[W]e must infer from [Brown's] decision to proceed [with the] trial without objection that he believed he had enough time to make use of the evidence." *United States v. Todd*, 825 Fed.Appx. 313, 320 (6th Cir.2020). Thus, Brown has forfeited any *Brady* claim.

### III. Conclusion

{¶ 38} We reverse the judgment of the First District Court of Appeals and remand the case to that court for it to consider Brown's remaining assignments of error.

Judgment reversed

and cause remanded.

KENNEDY, C.J., and DONNELLY and POWELL, JJ., concur.

FISCHER, J., concurs, with an opinion joined by DEWINE and POWELL, JJ.

BRUNNER, J., concurs in judgment only, with an opinion joined by STEWART, J.

MIKE POWELL, J., of the Twelfth District Court of Appeals, sitting for DETERS, J.

_____

**FISCHER, J., concurring.**

{¶ 39} I join the majority opinion. I write separately to express my disagreement with the inclusion of what I deem to be advisory language in the opinion concurring in judgment only. It is well established that this court does not issue advisory opinions. *See, e.g.*, *State ex rel. Davis v. Pub. Emps. Retirement Bd.*, 120 Ohio St.3d 386, 2008-Ohio-6254, 899 N.E.2d 975, ¶ 43; *State ex rel. Baldzicki v. Cuyahoga Cty. Bd. of Elections*, 90 Ohio St.3d 238, 242, 736 N.E.2d 893 (2000); *Egan v. Natl. Distillers & Chem. Corp.*, 25 Ohio St.3d 176, 177-178, 495 N.E.2d 904 (1986). But the opinion concurring in judgment only addresses issues that are not properly before this court, including Brown's actual guilt or innocence, the effectiveness of his trial counsel, and the merits of Brown's *Brady* claim. *See* opinion concurring in judgment only, ¶ 60, 65, 68, and 70; *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

{¶ 40} Brown's actual guilt or innocence and the effectiveness or ineffectiveness of his trial counsel are completely unrelated to the issues that are before this court and therefore should not be addressed by this court. Providing guidance on Brown's ineffective-assistance-of-counsel claim is particularly inappropriate because the First District Court of Appeals will need to address that issue on remand, and it should not be swayed by an advisory opinion from this court on an issue that is not before us. Furthermore, the merits of Brown's *Brady* claim should not be addressed because the opinion concurring in judgment only agrees with the majority opinion's determination that Brown waived his *Brady* claim by not seeking a continuance or mistrial. *See* opinion concurring in judgment only at ¶ 63. Because that claim was waived, we need not, and should not, address its merits.

{¶ 41} It is inappropriate and ill-advised for this court to issue advisory opinions because they have the potential to influence lower courts' resolution of issues without this court's having had the benefit of briefing or lower-court

analysis. That is why this court has long had a policy of not issuing advisory opinions, and I object to the deviation from that policy today by the opinion concurring in judgment only.

DeWine and Powell, JJ., concur in the foregoing opinion.

---

**Brunner, J., concurring in judgment only.**

### I. INTRODUCTION

{¶ 42} I agree with the majority that the evidence was sufficient to convict appellee, Rickey Brown, of robbery and that Brown's counsel did not preserve a due-process claim for review. However, the majority opinion's description of the facts and circumstances leading to the victims' identification of Brown is incomplete, and because Brown may be innocent and may have received ineffective assistance of counsel, I write separately to more fully discuss the facts and circumstances leading to Brown's convictions.

### II. FACTS AND PROCEDURAL HISTORY

{¶ 43} On June 16, 2020, a Hamilton County grand jury indicted Brown on two counts of aggravated robbery, two counts of robbery, and one count of having a weapon while under a disability. Brown waived a trial by jury, and the case proceeded to a bench trial. At the outset of trial, Brown stipulated that he was not permitted to possess a firearm, as a result of a prior conviction for burglary.

{¶ 44} The first witness to testify was a Cincinnati Police Department officer who was working on May 3, 2020. At 4:30 p.m. that day, the officer was called to the Avondale area on report of an armed robbery, where he encountered Holly Smothers and Sharlene Johnson Bryant. The two women reported that they were in the area for the purpose of buying a car (a 2001 Toyota Corolla CE) that they had seen advertised on the Letgo app. Smothers and Bryant told the officer that they had been approached by the purported car-seller, a black male who appeared to be about 20 years old, 5'5" tall, and 120 pounds. He was wearing all

black clothing, including a skull cap, shirt, and shorts. Smothers got out of her vehicle to examine the car she planned to buy and handed the money ($600) to Bryant. At that point, the purported seller brandished a handgun, demanded and received the money from Bryant, and fled. Neither witness mentioned tattoos when describing the man with the gun to the responding officer.

{¶ 45} The next witness to testify at trial was a Cincinnati Police Department detective, who had served as a blind administrator for the photographic lineups presented to Smothers and Bryant, as he had not been involved in the case. According to the detective, both women identified Brown as the suspect.

{¶ 46} During opening statements, the prosecutor had questioned how the police knew to include Brown in the lineup:

> [Prosecutor]: On the phone there was a name that was given that [the victims] thought they were dealing with, which was not Mr. Brown's correct name.
>
> The name was Danny Buckley; and that name was given to [the police officer in charge of the investigation], who forwarded that name to Real Time Crime, which is a Cincinnati division, or part of the Cincinnati Police Department.
>
> And what they can do is, when you give them a name of a person, they can somehow use their information system to find out what that person's real name and photo look like. And when he submitted that name to the Real Time Crime, it came back as Rickey Brown, and he got a photograph of Rickey Brown.
>
> [Defense]: Your Honor, I'm going to object to this.
>
> None of this information was provided in discovery, making statements about the Real Time crime.

16

> [Prosecutor]: I'm not planning on calling them as witnesses, Judge. This is how they got his photo.
>
> The name Danny Buckley was given to some department, and then it came back—they came back with his photo.

However, that representation turned out to be incorrect.

{¶ 47} When Smothers and Bryant testified, they confirmed the details of the robbery and identified Brown as the perpetrator, though they admitted that they had not noticed any tattoos on the man with a gun. Smothers initially testified that she had connected the Letgo profile for "Danny Buckley," whom she had agreed to meet, with Brown's Facebook account. But Smothers was vague about how she had made the connection, and toward the end of her testimony on direct and again during cross-examination, she testified in more detail about what happened after the robbery. Smothers ultimately testified that the day after the robbery, she found an advertisement on the Letgo app for what she perceived to be the same car. She used details she had observed in the Letgo app related to the car sale to locate Brown on Facebook. Believing that Brown looked like the man who had robbed her and Bryant, Smothers turned over photos of him to the police before they participated as witnesses in the police lineup. By providing Brown's photos, Smothers and Bryant assisted with the formation of the lineup for which they were the identifying witnesses in naming the robbery suspect.

{¶ 48} The prosecution's final witness at trial was the officer in charge of the investigation. He testified that Smothers contacted him and emailed him photos of the suspect on May 7 and that the photo lineup was created based on those materials. He testified that he never subpoenaed Letgo or searched for the "Danny Buckley" profile that had posted the original advertisement to determine whether it was linked to Brown. He also did not subpoena or otherwise obtain Smothers's and

Brown's phone records to determine whether they had spoken about the car on the phone as Smothers said she had with the sham seller.

{¶ 49} After the state rested, the defense put on an alibi case. First, Shemaiyah Thomas testified (and presented documentation to confirm) that May 3 was her birthday and that she had rented an Airbnb for that evening to celebrate there with Brown and Jasmine Pennington. Text messages with Brown corroborated Thomas's testimony that Brown and Pennington arrived at the Airbnb at 4:52 p.m., and Thomas testified that the three of them spent the remainder of the day together. Moreover, prior to Brown's arrival at the Airbnb, Thomas talked to him on the phone while he and Pennington were at Kroger purchasing birthday items, and Thomas could tell where they were because of the background noises. Pennington also testified that Brown was wearing jeans on the day in question (unlike the man with a gun, who was reported to have been wearing black shorts).

{¶ 50} Pennington testified next. She confirmed that starting at about 3:00 p.m. on May 3, she and Brown went to Kroger, then to Mr. Sushi, and then to the Airbnb. They briefly left the Airbnb together to return to Mr. Sushi when they realized that there was an error with the order that needed to be corrected. Pennington testified, in short, that she was with Brown in the car and at Kroger around the time of the robbery.

{¶ 51} Finally, Brown testified that he did not rob Smothers or Bryant. He testified, consistently with Pennington and Thomas, that he and Pennington went to Kroger and then to Mr. Sushi. He presented records from his debit card showing that he paid for food at Mr. Sushi on May 3. He also testified that the car he had attempted to sell on Letgo was a 1998 Toyota Corolla, not a 2001, and that his Letgo profile was under his name, Rickey Brown—not "Danny Buckley." In addition, he provided title records showing that he had owned and later sold a 1998 Toyota Corolla. He also pointed out that he is not 5'5" and 120 pounds but is 5'8" and was 150 pounds at the time of the robbery (he was 170 pounds by the time of

trial). He further demonstrated the extensive tattoos on his arms. Finally, Brown testified that he had pled guilty to burglary in the past, because he had committed it. However, he maintained that he did not commit this robbery.

{¶ 52} The trial judge found Brown guilty of one count of aggravated robbery (of Bryant), one count of robbery (of Smothers), and one count of having a weapon while under disability.

{¶ 53} Two weeks after the verdict, Brown requested a new trial, arguing that the prosecution had failed to disclose the fact that Smothers and Bryant did their own flawed investigation that led them to incorrectly identify Brown as the man with a gun. That investigation, he argued, rendered the lineup procedure and subsequent identifications unreliable—a fact that could have been explored by the defense through the introduction of expert testimony had the defense been aware of it before trial. The trial court denied the motion, reasoning:

> Criminal Rule 33 governs consideration in the factors that the Court must consider when deciding the trial. The grounds clearly set forth in Rule 33, irregularity, misconduct, accident or surprise or just that a burden is not sustained by sufficient evidence or is contrary to law.
>
> The Court finds that none of those factors were established by the defense to grant a new trial. I know that the defense does rely on an alleged Brady violation. I will note for the record that the information that the defense relies on, and that is very specific that the defendant did know prior to trial that one of the eyewitness victims had done her own prior investigation to find Facebook photos of the defendant in order to give them to the police to say here's the guy that robbed us.

But I will note that during the trial, there was rigorous cross-examination of that information with the witnesses while on the stand. And [the defense] did a very good job at cross-examining witnesses.

I do not believe based on the evidence that even if the defense had known that prior to trial that it would have resulted in a different verdict or outcome. And so for those reasons the motion for a new trial is denied.

The trial court then proceeded directly to sentencing and imposed a prison sentence of six years.

{¶ 54} On appeal, the First District reversed, finding insufficient evidence that Brown robbed Smothers because it was undisputed that Brown took the money from Bryant, not Smothers. 2022-Ohio-2752, 198 N.E.3d 111, ¶ 50-54. It also found that the trial court erred in denying Brown's motion for a new trial:

Although the trial court concluded that the motion was based on newly discovered evidence pursuant to Crim.R. 33(A)(5), the motion alleged prosecutorial misconduct for *Brady* violations under Crim.R. 33(A)(2) for withholding evidence. The evidence that was withheld was that Smothers, while conducting her own investigation, determined that Danny Buckley's Letgo account was linked to Brown's Facebook page. The discovery of this link led Smothers to identify Brown as the perpetrator after viewing his Facebook photos. Smothers printed the photos and showed them to [Bryant] before the police lineup. The photos were then given to [the police] who used the photos to generate a lineup.

It is clear from the prosecutor's opening statement and [the] testimony [of the officer in charge of the police investigation] that [the officer] was aware of Smothers's investigation and identification of Brown and did not inform the prosecutor. In his opening remarks, the prosecutor stated that the Real Time Crime unit's investigation revealed that Danny Buckley was an alias for Rickey Brown. Based on this investigation, a police lineup was conducted, and both Smothers and [Bryant] identified Brown. After identifying Brown as the suspect, Smothers went to Brown's Facebook page and printed the photos. Although the prosecutor did not act in bad faith, the inquiry is whether Brown's due-process rights were violated by the withholding of the evidence. [*State v.* ] *Johnston*, 39 Ohio St.3d [48] 60, 529 N.E.2d 898 [1988]; *Brady*[ *v. Maryland*], 373 U.S. [83] 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 [1963].

Smothers identified Brown as the robber based upon her own investigation. This evidence was material because the identification of Brown as the robber was the sole evidence used to convict him. In finding Brown guilty, the trial court relied primarily on the identifications made by Smothers and [Bryant]. After viewing the Facebook photos of Brown, both positively identified him in the police lineup, although their initial descriptions of the robber with the gun did not match Brown, and neither noticed the tattoos covering both of his arms.

* * *

* * * Accordingly, identification was the sole issue of dispute in this case. Brown provided three witnesses, text messages, and two transaction reports to establish that he was at Kroge[r] and Mr. Sushi in Clifton at the time of the robbery. Brown was wearing

jeans that day, and the person who committed the robbery was wearing shorts. The robber was accompanied by another black male, and Brown was with a female.

Smothers testified that Brown's Facebook page was linked to Danny Buckley's account, but could not articulate how she made that determination. Smothers stated that she found the same car for sale the following day, but the car that Brown listed for sale was a 1998 Toyota Corolla LE, not a 2001 Toyota Corolla CE. Danny Buckley's account had been verified by Google, and the record is unclear as to how Smothers determined Buckley's account was linked to Brown's Facebook page.

For these reasons, we find that our confidence in the trial court's verdict is undermined, and Brown's substantial rights were materially affected. Had the state disclosed Smother[s]'s investigation leading to her identification of Brown as the robber, Brown would have had an opportunity to challenge both the alleged link to his Facebook page and the reliability of the identification.

*Id.* at ¶ 60-67. Based on these conclusions, the First District deemed moot Brown's remaining assignments of error, *id.* at ¶ 69, including his contention that "trial counsel was ineffective for failing to request a continuance to investigate critical, surprise evidence," *id.* at ¶ 49.

{¶ 55} The state appealed, and we accepted the appeal on two propositions of law:

1. An individual is a victim of robbery under R.C. 2911.02(A)(2) when that individual is the owner of what is stolen,

is the offender's intended target, and is also in close proximity to the gun brandished by the offender as the property is taken.

2. A Brady violation does not occur under Crim.[R.] 33(A)(2) when a witness confirms the suspect's identification via social media and such evidence is available at trial.

*See* 168 Ohio St.3d 1470, 2022-Ohio-4380, 199 N.E.3d 545.

### III. DISCUSSION

{¶ 56} For clarity of discussion, I will address Brown's second proposition of law first.

### A. Second Proposition of Law—*Brady* Violation

{¶ 57} The prosecution has an "affirmative duty to disclose evidence favorable to a defendant," and that duty forbids suppression by the prosecution of evidence "favorable" to an accused "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The duty to disclose persists even in the absence of a defense request. *See United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Further, the prosecution may not claim ignorance, since a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles* at 437. And this duty involves a determination of whether such evidence is material to the defendant. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Lawson*, 64 Ohio St.3d 336, 343, 595 N.E.2d 902 (1992), quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d

481 (1985) (lead opinion). And the materiality of "suppressed evidence [is] considered collectively, not item by item." *Kyles* at 436.

{¶ 58} In this case, it is apparent that the prosecution did not disclose that Smothers's online sleuthing was its basis for linking "Danny Buckley" to Brown. The trial transcript indicates that even during opening statements, the prosecutor appeared unaware of Smothers's investigation.

{¶ 59} Initially, Smothers's testimony appeared to inculpate rather than exculpate Brown. But Smothers's testimony presented serious questions about the reliability of her identification of Brown that were material to his defense. The fact that Smothers had conducted her own online investigation should have been disclosed in advance of trial. The cross-examination of Smothers revealed that she conducted that investigation the day after the robbery, found what she believed to be the same car advertised on Letgo, and used that to find Brown's Facebook page. The upshot of this testimony is that Smothers may well have identified the wrong man, because Brown was selling a similar but not identical car—a 1998 Toyota Corolla as opposed to a 2001 Toyota Corolla. The potential for misidentification is further confirmed by the fact that Brown did not physically resemble the man with a gun in size (being 3 inches taller and 30 pounds heavier), was dressed differently on the day of the robbery, and had extensive tattoos, which neither victim noticed on the man with the gun. Moreover, Brown had a plausible and reasonably well-documented alibi. This is all-the-more concerning because the police essentially did nothing to confirm or dispute the results of Smothers's investigation. The police simply took the photos she provided and included Brown in the lineup even though Smothers was the witness making an identification of the suspect for the police.

{¶ 60} Because Brown never had this information before trial, he was deprived of the opportunity to challenge Smothers's investigation. Had he been informed of Smothers's part in preparing the lineup, he could have, for example,

reviewed her records, Letgo's records, or phone records; determined what advertisements were linked with his Facebook page; and argued that the link she drew to him was mistaken. He also could have hired an expert to testify about confirmation bias and the tainted uselessness of the later police and in-court identifications, given that Smothers and Bryant had already determined that Brown was the man with a gun, based on their incorrect belief that he was advertising the same car. In short, Smothers's amateur investigation turned out to be the crux of the state's evidence in the case. The state's failure to disclose that investigation before trial deprived Brown of material evidence that was favorable to his defense and undermines confidence in his guilt.

{¶ 61} But the majority and the state are correct that despite the fact that Smothers's investigation was at the core of the prosecution's case, it was revealed at trial before the verdict and with enough time for the defense to act on the information. Thus, this is not a typical *Brady* violation. We have previously stated:

> Strictly speaking, *Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence. *State v. Wickline* (1990), 50 Ohio St.3d 114, 116, 552 N.E.2d 913, 917. In such a circumstance a trial court has authority, pursuant to Crim.R. 16(E)(3),[2] to grant a continuance or make other orders that the court deems just to ensure that the recently disclosed information can be evaluated, and used at defense counsel's option, before the trial is concluded.
>
> It has, however, been held that the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potentially exculpatory evidence during trial may constitute a due

---

2. For the current language, see Crim.R. 16(L)(1).

process violation if the late timing of the disclosure significantly impairs the fairness of the trial. Even where information may be exculpatory, "no due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading & Paving, Inc.* (C.A.4, 1985), 760 F.2d 527, 532. *See, also*, *United States v. Starusko* (C.A.3, 1984), 729 F.2d 256, 262; *United States v. O'Keefe* (C.A.5, 1997), 128 F.3d 885, 898.

*State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001). While the defense tried to make effective use of the belatedly disclosed material evidence, it failed to do so largely because it was unable to definitively flesh out how Smothers came across Brown's Facebook page or illustrate why her discovery of it tainted the later lineups.

{¶ 62} It is undisputed that the defense did not seek to avail itself of Crim.R. 16(L)(1) to seek a continuance or mistrial to give it the opportunity to evaluate, investigate, and take full advantage of the belatedly disclosed information.

{¶ 63} I agree with the majority's conclusion that Brown's trial counsel forfeited any due-process claim by not seeking a continuance or mistrial to afford the defense time to explore and make effective use of the information about Smothers's investigation. *See Iacona* at 100-101. But I note that on remand, Brown will have the opportunity to argue that his counsel was ineffective for failing to seek a continuance or mistrial.

{¶ 64} Ineffective-assistance-of-counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "In evaluating counsel's

performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action "might be considered sound trial strategy." ' " *State v. Roush*, 10th Dist. Franklin No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689; *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955). To show that a defendant has been prejudiced by counsel's deficient performance, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694; *accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 65} It is, at a minimum, questionable whether any reasonable counsel would have ignored or discarded so significant an opportunity as this to demonstrate the innocence of a client. A new trial would have permitted Brown's counsel to fully examine the underpinnings of Smothers's amateur investigation, which may have shown that there was no link at all between "Danny Buckley" on Letgo and Brown's Facebook account—or better yet, may have identified the real "Danny Buckley." Though effective assistance is not now before this court as a proposition of law, it was raised by Brown in the First District and was deemed moot by that court in favor of the *Brady* issue. *See* 2022-Ohio-2752, 198 N.E.3d 111, at ¶ 49, 69. The majority rightly remands this case to the First District for consideration of Brown's remaining assignments of error, including this one. I write separately to point out that the revelations relating to how Brown was identified, particularly given his alibi evidence, do raise significant questions about the effectiveness of his representation.

## B. First Proposition of Law—The Evidence Was Sufficient to Show that Brown Robbed Smothers

{¶ 66} The parties here do not dispute that the man with a gun engaged in false advertising and communications with Smothers to lure her to bring $600 to the spot where he intended to (and did) steal the money. Minimally, this constitutes an attempted theft and/or fraud against Smothers. *See, e.g.*, R.C. 2913.02; R.C. 2913.05 (telecommunications fraud). Thus, the required "theft offense" predicate for a robbery conviction is satisfied. *See* R.C. 2911.02(A). The remaining question is whether the man with the gun, in the attempt or commission of the theft, inflicted, attempted to inflict, or threatened to inflict physical harm on Smothers. *See* R.C. 2911.02(A). The officer who responded to the scene testified that Smothers and Bryant reported that the man with the gun "came to the passenger side of the car; brandished a black handgun; demanded the money; and demanded the money a second time while pointing the gun at both of the victims, * * * who were obviously very shaken up over it." And Smothers herself testified that when she turned around after handing the money to Bryant, the man with the gun was standing close to Smothers.

{¶ 67} In her testimony, Smothers contradicted the officer's recounting insofar as she stated that the gun was never pointed at her and that the man with the gun instead pointed it at Bryant when he demanded the money. But whether or not the gun was ever pointed directly at Smothers, " 'viewing the evidence in a light most favorable to the prosecution,' " a " 'rational trier of fact could have found' " that the man with the gun implicitly threatened both women with physical harm, *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), at paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 N.E.2d 668 (1997), fn. 4. I agree

with the majority that Smothers was not a mere bystander—she was robbed along with Bryant.

{¶ 68} As noted, I have grave doubts about whether the man with the gun was in fact Brown, but viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have credited the testimony of Bryant and Smothers that Brown was the man with the gun and that he robbed both women, *see Monroe* at ¶ 47. Thus, I concur in the majority's reversal of the First District's determination that the evidence was insufficient to convict Brown of the robbery of Smothers.

## IV. CONCLUSION

{¶ 69} I agree with the majority's conclusions that Brown's counsel forfeited the due-process claim and that the evidence was sufficient to convict Brown of the robbery of Smothers. Accordingly, I concur in the court's judgment reversing the judgment of the First District Court of Appeals and remanding the case to that court for it to consider, among other issues, whether Brown's counsel was ineffective.

{¶ 70} However, I write separately because, although her testimony is somewhat less than perfectly clear, it appears that Smothers conducted her own investigation the day after the robbery, found an advertisement for what she believed to be the same car, and used that vehicle to find Brown's Facebook page. The upshot of that testimony is that Smothers may well have identified the wrong man because Brown was selling a similar but not identical car—a 1998 Toyota Corolla as opposed to a 2001 Toyota Corolla. The potential misidentification is further confirmed by the fact that Brown did not physically resemble the man with a gun in size (being 3 inches taller and 30 pounds heavier), was dressed differently on the day of the robbery, and had extensive tattoos, which neither victim had noticed on the man with the gun. That little was done to confirm or dispute the results of Smothers's investigation and that they were used to create the lineup for

29

identification by the very same person who supplied Brown's information should have been disclosed to Brown prior to trial; these facts were material to his defense in addition to his credible, documented alibi. It seems that Brown may actually be innocent but was impaired in his defense by ineffective assistance of counsel in the failure to seek a continuance or mistrial to investigate the information about Smothers's investigation.

{¶ 71} With respect to the sufficiency inquiry, I agree with the majority's conclusion that the First District erred and that the evidence was sufficient to support Brown's conviction for robbery. Smothers and Bryant testified that they were lured to bring money to the scene on the false promise of an automobile sale. That constitutes a theft offense. When they arrived with the money to purchase the car, they were met by a man with the gun demanding money, which they gave him. That constitutes robbery. Even with the credibility of the identification in question, under a sufficiency analysis, in which all inferences are drawn in favor of the prosecution, the identification of Brown was not insufficient.

{¶ 72} With this explanation, I concur in the court's judgment.

STEWART, J., concurs in the foregoing opinion.

———————————

Melissa A. Powers, Hamilton County Prosecuting Attorney, and Paula E. Adams, Assistant Prosecuting Attorney, for appellant.

Michael J. Trapp, for appellee.

Dave Yost, Ohio Attorney General, Michael J. Hendershot, Chief Deputy Solicitor General, and Zachery P. Keller, Deputy Solicitor General, urging reversal for amicus curiae Ohio Attorney General Dave Yost.

Elizabeth R. Miller, Ohio Public Defender, and Addison Spriggs and Nicholas Allen, Assistant Public Defenders, urging affirmance for amicus curiae Ohio Public Defender.

———————————