[Cite as *State v. Stinson*, 2025-Ohio-2731.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLANT,

  v.

BOBBY MICHAEL STINSON,

    DEFENDANT-APPELLEE.

CASE NO. 9-24-37

OPINION AND
JUDGMENT ENTRY

Appeal from Marion County Common Pleas Court
General Division
Trial Court No. 23 CR 43

Judgment Reversed

Date of Decision: August 4, 2025

APPEARANCES:

    *Allison M. Kesler* for Appellant

    *Paul L. Scarsella* for Appellee

**MILLER, J.**

{¶1} The Appellant, State of Ohio, appeals from the July 26, 2024 judgment issued by the Marion County Court of Common Pleas granting a Motion to Dismiss with Prejudice, filed by Defendant-Appellee, Bobby Michael Stinson ("Stinson"). Based on alleged *Brady* violations and the Double Jeopardy Clause, the trial court sanctioned the State by dismissing the indictment against Stinson with prejudice and assessing court costs against the prosecutor's office. For the reasons that follow, we find that the trial court committed reversible error in determining the State had committed a *Brady* violation, deciding double-jeopardy protection applied, and imposing the sanctions. We reverse the trial court's July 26, 2024 judgment and remand for further proceedings in accordance with this opinion.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Indictment and Trial

{¶2} On February 1, 2023, the Marion County Grand Jury indicted Stinson on five charges:

1. Aggravated Robbery, pursuant to R.C. 2911.01(A)(1), a first-degree felony;

2. Aggravated Robbery, pursuant to R.C. 2911.01(A)(3), a first-degree felony;

3. Felonious Assault, pursuant to R.C. 2903.11(A)(1), a second-degree felony;

4. Felonious Assault, pursuant to R.C. 2903.11(A)(2), a second-degree felony; and

5. Theft, pursuant to R.C. 2913.02(A)(1), a fifth-degree felony.

Notably, in support of the theft charge (Count 5), the indictment alleged the property at issue was a cell phone "valued at one thousand dollars or more and less than seven thousand five hundred dollars"—corresponding to the theft being a fifth-degree felony.

{¶3} On February 10, 2023, defense counsel served the State with a demand for discovery, requesting disclosure of all possible material or relevant evidence that the prosecutor had acquired or will be acquiring to which Stinson was entitled under Crim.R. 16(B). In response, the State made disclosures and delivered a variety of evidence, including police statements and police officer body camera videos.

{¶4} On May 14, 2024, the case proceeded to trial. The first witness was Brian Griffith ("Griffith"), the alleged victim. Griffith testified that Stinson had communicated with him a couple of weeks prior to the alleged crimes about a woman who was the mother of Stinson's children. At the time, Griffith had been sleeping with the woman. The nature of the communication was a threat from Stinson to Griffith that, if Stinson saw Griffith, then Stinson would injure him.

{¶5} According to Griffith, on the night of the alleged crimes, Stinson confronted him and said, "Stay away from my bitch" and "I told you stay away from my bitch." (May 14, 2024 Trial Tr. at 261-262). Stinson then swung a bat at him,

-3-

striking and injuring him. Some of Griffith's belongings fell onto the ground. Stinson picked up Griffith's cell phone and ran away. Griffith testified that the cell phone was an iPhone 13, he never got it back, and he thought he paid $1,300 for it. He specifically testified that he paid more than $1,000 but less than $7,500.

{¶6} On cross-examination, Griffith testified he had purchased the cell phone shortly before the incident and it worked at the time Stinson took it from him. The following exchange then took place:

Q: . . . And your testimony is that you paid 1,300 dollars for that phone that's a year old at that point?

A: Yep. I think it was 1,200. I turned in the receipt.

Q: Okay. Where'd you buy it from?

A: T-Mobile.

(*Id.* at 310). Defense counsel then asked for a sidebar, during which he indicated there was a possible discovery issue because he had not received the receipt mentioned by Griffith. The prosecutor said he was unaware of any receipt. Griffith then further testified that he had turned the receipt into the victim's advocate of the Marion County Prosecutor's Office.

{¶7} At that point, defense counsel asked for another sidebar. During this sidebar, defense counsel asserted there was a Crim.R. 16 issue because the receipt would be evidence going directly to an essential element of the alleged theft and asked that Count 5 be dismissed. The prosecutor indicated he was going to try to

contact the victim's advocate.  Questioning of Griffith proceeded.  Then, during a recess, the prosecutor was able to obtain the receipt.  The prosecutor explained that Griffith had given it to the victim's advocate and the victim's advocate had apparently mislabeled the document and it was put into the wrong category of materials—resulting in the receipt *not* being put into the discovery materials to be provided to the defense.  The prosecutor admitted it was his responsibility to turn it over to the defense, but said there was nothing willful about not doing so as he was unaware of the receipt until Griffith mentioned it during cross-examination.

{¶8} The judge expressed frustration saying, "I am so tired of addressing these issues where things are coming out during trial that never have been turned over." (May 14, 2024 Trial Tr. at 327).  The court added that it did *not* believe the prosecutor had intentionally failed to turn over the receipt to the defense, but that it still had been the prosecutor's obligation to turn it over.  Defense counsel conceded that he too did not believe the prosecutor purposely withheld the receipt.  Defense counsel also conceded the receipt was "not exculpatory," although he believed it was "very damning evidence that would indicate an essential element of one of the indicted charges." (*Id.* at 337-338).  The judge said he "could very much see [the victim's advocate] get this piece of paper from the victim and think it's restitution related," but agreed with defense counsel that it related to an element of the offense. (*Id.* at 341).  The prosecutor pointed out that the discovery materials previously

provided to the defense contained a report indicating Griffith's cell phone was valued at $1,000. Thus, in addition to the indictment alleging the value, the judge acknowledged defense counsel had some notice in discovery that the phone was valued at $1,000 or more. The trial proceeded for the rest of the day, with testimony from three other witnesses for the State, and was set to resume the next day with additional testimony.

### B.    May 15, 2024 Proceedings

{¶9} The next morning before the trial resumed, Stinson's counsel moved to dismiss the indictment with prejudice or, if that was not granted, a mistrial. He argued that the State (not the individual prosecutor handling the trial) had willfully withheld the receipt from defense counsel prior to trial. He also argued that the receipt was relevant to impeachment and that it affected Counts 1, 2, and 5 because it related directly to "essential elements" of those charges. (May 15, 2024 Trial Tr. at 10). The judge again noted he thought "it was evident from [the prosecutor's] reaction yesterday that he was unaware of the receipt being in the" State's custody. (*Id.* at 2).

{¶10} The trial court then allowed proffered testimony from Griffith concerning the receipt, a copy of which the State had by then provided to defense counsel. Griffith testified he sent the receipt to the victim's advocate of the Marion County Prosecutor's Office about a month or two before the trial started. The

receipt indicated a price for the phone of $1,099.00 (and a total amount, with tax, of $1,179.74). Thus, it confirmed the State's position—and Griffith's testimony—that the value of the stolen property was $1,000 or more. Griffith testified he actually paid more than the $1,099.00 amount indicated on the receipt because he had previously paid some money towards the phone. He also testified that he bought the phone from AT&T (as indicated on the receipt) and had mistakenly testified the previous day that he bought it at T-Mobile.

{¶11} After the proffered testimony, the prosecutor again explained he had been unaware of the receipt and he "would have turned it over immediately" if he had known of its existence. (*Id.* at 81). The trial court decided "this is a violation of Criminal Rule 16" because the receipt had been in the State's possession for a month or two prior to the trial and it was "clearly a document that should have been provided to the defense." (*Id.* at 84). The trial court again said it did not find the prosecutor (or the prosecutor's office) acted willfully, but the receipt was clearly relevant to Count 5 and affected the victim's credibility. The trial court therefore declared a mistrial. It reset the matter for briefing and argument regarding whether the mistrial should be with or without prejudice, and it set a new trial date of August 6, 2024.

### C.     Post-mistrial Proceedings

{¶12} On June 12, 2024, Stinson filed a motion to dismiss the indictment with prejudice.  In support, Stinson explained that—in addition to the State's failure to turn over the receipt—the State had produced additional discovery responses *since the mistrial was granted* that included two additional hours of body camera footage from the night of the alleged crimes.  Stinson argued the State had violated his Constitutional rights by withholding material and exculpatory evidence from him.  He also argued the prosecution's actions caused the mistrial and the Double Jeopardy Clauses of the Federal and Ohio Constitutions precluded a retrial.

{¶13} On July 25, 2024, the trial court held a hearing.  The judge probed Stinson's reference in his motion to the additional production of two hours of body camera footage.  Defense counsel explained the footage was from two sheriff deputies who had gone to Stinson's residence on the night of the incident and that Stinson's vehicle could be seen at the residence in the footage.  The prosecutor explained that the two deputies had been called to the residence simply to secure the perimeter, they were not involved in the search of the residence, the two videos showed nothing other than the deputies standing on a perimeter, and he had no intent to call the deputies as witnesses (thus implying he would not have played the videos at trial).  He further explained that he had discovered the videos himself after the mistrial when he re-reviewed everything, saw that he did not have body camera

footage from the two deputies, obtained it from the sheriff's office, and immediately produced it to defense counsel upon receipt.

{¶14} The judge, after noting that he recalled there had been testimony during the trial about Stinson's car being at his residence, specifically asked defense counsel about the potential impeachment or evidentiary value of the two videos. Defense counsel said one of the defense's arguments was that Stinson's car was at his residence; he thought there was "potential evidentiary value"; and it affected what his trial strategy would have been. (July 25, 2024 Tr. at 26). Defense counsel also acknowledged that, during the trial, an officer had testified he went to Stinson's residence the night of the incident, he saw the car, and the car was cold when he touched it. Defense counsel also surmised the video "obviously had some [evidentiary] value or it wouldn't have been turned over" by the State. (*Id.* at 27).

{¶15} On July 26, 2024, the trial court issued a judgment entry. It determined that the State had violated its *Brady* obligations with respect to both the receipt and the two body camera videos. Concerning the receipt, the trial court found that it was "materially exculpatory." (July 26, 2024 Judgment Entry at 15). Specifically, it explained that the receipt was inconsistent with Griffith's testimony and material to impeachment of Griffith. According to the trial court, the receipt raised issues concerning the value of the phone, the date of the purchase, the carrier, and the credibility of the witness—especially as to his memory. The trial court also stated

the receipt "would be useful to cross examine" Griffith and concluded it "has significant exculpatory value." (*Id.*).

{¶16} Regarding the body camera videos, the trial court found the two additional videos constituted "*Brady* material as well." (*Id.* at 8). It referenced that—unlike the receipt—they were not located or disclosed until after the mistrial but that the names of the two deputies had been turned over in discovery prior to trial. The trial court found the videos were "footage from two deputies who attempted to locate the Defendant" and "showed the Defendant's vehicle, which related to testimony that the State presented at trial." (*Id.* at 16). It explained there was testimony at the trial regarding the vehicle being cold to the touch and, therefore, "[t]he videos of officers at the vehicle were material for the alibi defense." (*Id.* at 10). The trial court also decided they "were relevant to the preparation of the Defendant's alibi defense." (*Id.* at 17). The trial court found them "to have exculpatory value and therefore [are] also *Brady* material." (*Id.*).

{¶17} The trial court noted that the prosecution had stated multiple times leading up to the trial that discovery was complete, but it turned out discovery actually was not complete. The trial court proceeded to explain that it had addressed issues concerning delayed and undisclosed discovery by the State repeatedly in numerous other, unrelated cases. It then found that double jeopardy applied because "these are systemic prosecutorial failures" that "goad mistrials, and therefore

warrant finding that double jeopardy applies." (*Id.* at 26). The trial court dismissed the case against Stinson with prejudice and assessed court costs against the Marion County Prosecutor's Office. This appeal followed.

## II.    ASSIGNMENT OF ERROR

{¶18} The State raises a single assignment of error for our review:

### Assignment of Error

**The trial court unreasonably, arbitrarily, and unconscionably found the State of Ohio violated Crim.R. 16, dismissed the case with prejudice, and imposed court costs upon the Marion County Prosecutor's Office.**

## III.    DISCUSSION

{¶19} In the assignment of error, the State argues that the trial court's reliance on *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny was error because it was not applicable. The State also asserts that neither the receipt nor the body camera videos were exculpatory and, therefore, were not *Brady* material. Finally, it argues "the trial court unreasonably, unconscionably, and arbitrarily imposed a dismissal with prejudice and costs upon the Marion County Prosecutor's Office." (Appellant's Brief at 10).[1]

---

[1] The State is not appealing the trial court's decision to continue the trial and declare a mistrial, which the State references as sanctions the trial court had already imposed. This is unsurprising given that we could not undo a continuation or restart the first trial.

**A.** **Standards of Review**

{¶20} "Generally, we review a trial court's decision on a motion to dismiss an indictment for an abuse of discretion." *State v. Hudson*, 2022-Ohio-1435, ¶ 19. A trial court abuses its discretion when its conduct is unreasonable, arbitrary, or unconscionable. *State v. Hill*, 2022-Ohio-4544, ¶ 9. However, when the issue presented raises a question of law, we review the trial court's decision de novo. *Hudson* at ¶ 19 (reviewing, de novo, the trial court's denial of a motion to dismiss an indictment based on lack of subject-matter jurisdiction); *see also Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38 (courts lack discretion to make an error of law or to misapply the law).

**B.** **There Was No *Brady* Violation**

**1.** **Principles from *Brady* and its progeny**

{¶21} In *Brady*, the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. For there to be a *Brady* violation, the defendant must demonstrate that (1) the evidence at issue is favorable to the defendant, (2) the State suppressed the evidence, and (3) the defendant was prejudiced as a result. *State v. Brown,* 2024-Ohio-749, ¶ 30; *see also*

*Strickler v. Greene*, 527 U.S. 263, 281-282 (1999) (a *Brady* violation consists of three components).

{¶22} "Favorable evidence under *Brady* encompasses both exculpatory and impeachment evidence." *State v. Davis*, 2008-Ohio-2, ¶ 338, citing *United States v. Bagley*, 473 U.S. 667, 674-676 (1985). Next, relevant to the question of whether the State suppressed the evidence, "the prosecution has 'a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.'" *State v. McNeal*, 2022-Ohio-2703, ¶ 22, quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Finally, relevant to the question of prejudice, "[e]vidence is material within the meaning of *Brady* only if there exists a 'reasonable probability' that the result of the trial would have been different had the evidence been disclosed to the defense." *Davis* at ¶ 338, quoting *Kyles* at 433-434, quoting *Bagley* at 682; *see also Brown*, 2024-Ohio-749, at ¶ 30. "'A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *Davis* at ¶ 338, quoting *State v. Johnston*, 39 Ohio St.3d 48 (1988), paragraph five of the syllabus. "As a rule, undisclosed evidence is not material simply because it may have helped the defendant to prepare for trial." *State v. Brown*, 2007-Ohio-4837, ¶ 49; *see also State v. Owens*, 2017-Ohio-2590, ¶ 29 (3d Dist.) ("this court has consistently determined that materiality does not refer to the defendant's ability to prepare for trial").

**2.** **Crimes charged and impact of the stolen property's value**

**{¶23}** Stinson was charged in Count 5 with theft. In relevant part, the statute provides that no person, with purpose to deprive the owner of property, shall knowingly obtain or exert control over the property without the consent of the owner or person authorized to give consent. R.C. 2913.02(A)(1). The State alleged that the stolen property was valued at $1,000 or more and less than $7,500. Accordingly, the charge was for a fifth-degree felony. R.C. 2913.02(B)(2). If the value of the stolen property was less than $1,000, then violating the statute would be a first-degree misdemeanor. *Id.* Therefore, in this case, the value of the cell phone allegedly stolen from Griffith would affect the available punishment if Stinson were to be convicted of the offense, not whether he had committed theft. *See State v. Smith*, 2009-Ohio-787, ¶ 7 ("[w]hile the special findings identified in R.C. 2913.02(B)(2) affect the punishment available upon conviction for the offense, they are not part of the definition of the crime of theft set forth in R.C. 2913.02(A)").

**{¶24}** Stinson was charged in Counts 1 and 2 with committing aggravated robbery. That statute provides, in relevant part,

> (A) No person, in attempting or committing a theft offense, as defined in [R.C. 2913.01], or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> > (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
> >
> > . . .

-14-

(3) Inflict, or attempt to inflict, serious physical harm on another.

. . .

(C) Whoever violates this section is guilty of aggravated robbery, a felony of the first degree.

R.C. 2911.01(A)(1), (A)(3), (C). Therefore, the value of the cell phone would *not* impact Counts 1 or 2 because a theft offense as defined in R.C. 2913.01 includes any violation of R.C. 2913.02—regardless of the stolen property's value. *See* R.C. 2913.01(K) (defining "theft offense" to include a violation of R.C. 2913.02). The value of the cell phone likewise would *not* impact Counts 3 and 4, which charged Stinson with committing felonious assault and do not pertain to a theft offense.

### 3. Application of legal principles

{¶25} We first address the trial court's decision that the State committed a *Brady* violation by not disclosing the receipt until during the trial. Significantly, the Supreme Court of Ohio recently said it has not decided "whether a *Brady* violation is ever properly grounded in evidence that is disclosed during trial." *Brown*, 2024-Ohio-749, at ¶ 31-32. This statement in *Brown* appears to overlook some earlier decisions by the Court. *See State v. Hanna*, 2002-Ohio-2221, ¶ 82 ("the state did not violate *Brady v. Maryland* by withholding exculpatory evidence" because the evidence "was presented *during* the trial (and not after the trial as in *Brady*), and no violation exists" [emphasis in original]); *State v. Wickline*, 50 Ohio St.3d 114, 116

(1990) ("[a]s the alleged exculpatory records were presented *during* the trial, there exists no *Brady* violation requiring a new trial" [emphasis in original]).

{¶26} In *Brown*, the Court pointed out an earlier decision where three justices in the lead opinion explained that, "'[s]trictly speaking, *Brady* is not violated when disclosure occurs during trial, even when disclosure surprises the defendant with previously undisclosed evidence.'" *Brown*, 2024-Ohio-749, at ¶ 31, quoting *State v. Iacona*, 93 Ohio St.3d 83, 100 (2001). However, the lead opinion in *Iacona* had "suggested that 'the philosophical underpinnings of *Brady* support the conclusion that even disclosure of potential exculpatory evidence during trial may constitute a due process violation if the late timing of the disclosure significantly impairs the fairness of the trial.'" *Id.*, quoting *Iacona* at 100. "The lead opinion then went on to analyze the defendant's contention that the trial court erred by failing to grant her motion for a mistrial 'in this context.'" *Id.*, quoting *Iacona* at 100. We note that the Court in *Brown* clarified it did not need to decide whether to adopt this test from the lead opinion in *Iacona* because the defendant had forfeited any *Brady* claim. *Id.* at ¶ 31-32.

{¶27} The trial court here never addressed the applicability of *Brady v. Maryland*. Instead, the judgment entry shows it merely assumed a *Brady* violation may be properly grounded in evidence disclosed during trial and applied the three-part test derived from *Brady* as set forth above. We could simply rely on the

rationale in *Hanna* and *Wickline* to find the trial court erred as a matter of law because there could be no *Brady* violation given the disclosure of the receipt occurred *during* trial. However, we also review the three *Brady* requirements set forth in *Brown* and conclude that the late timing of the receipt's disclosure did not "significantly impair[] the fairness of the trial" and, therefore, the trial court erred in finding a *Brady* violation. *Iacona* at 100 (lead opinion).

{¶28} The receipt was not exculpatory evidence. On the contrary, it actually proved the State's claim that the value of the phone was $1,000 or more. Further, if the prosecutor trying the case knew of the receipt's existence, he would have used it during trial because—as he acknowledged—"it was the best evidence that the State could have had to prove" the value of the phone. (July 25, 2024 Tr. at 17). Having Griffith identify the receipt would have solidified the cost of the cell phone, as well as when and where it was purchased, thus eliminating these matters from potential impeachment. Even if the receipt could have been used as impeachment evidence during Griffith's testimony, any impeachment would have concerned very minor matters. For example, although Griffith testified he bought the cell phone from T-Mobile, the receipt indicated he bought it from AT&T and, although Griffith testified he purchased the phone "probably" in the beginning of October 2022, the receipt indicated a date of August 22, 2022. (May 14, 2024 Trial Tr. at 307-310). In contrast, both Griffith's testimony and the receipt aligned on the significant issue

raised by the receipt: the value of the cell phone was $1,000 or more and less than $7,500.[2] *See Davis*, 2008-Ohio-2, at ¶ 339 (although the undisclosed information might have impeached the witness's credibility, there was no *Brady* violation because "impeachment evidence would not have been significant in the outcome of the case" given DNA evidence established guilt).

{¶29} Moreover, although obviously not ideal, the prosecutor located and produced the receipt to the defense while the trial was still pending and the defense could have sought to bar its use by the prosecution or could have used it during the trial to cross-examine Griffith about the details of the cell phone purchase, much like it did during his proffered testimony. Ultimately, the tardy disclosure of the receipt did not "significantly impair[] the fairness of the trial." *Iacona*, 93 Ohio St.3d at 100; *see also State v. Payne*, 2010-Ohio-1018, ¶ 32 (10th Dist.) (fairness of trial not significantly impaired despite "the unarguably late timing of the disclosure" of evidence after a witness—with whom the evidence could have been used—had already testified).

{¶30} Next, we address the trial court's decision that the State also committed a *Brady* violation by not disclosing the two body camera videos until after the mistrial. Importantly, "[e]vidence which is merely cumulative is

---

[2] Defense counsel even acknowledged that "[w]here and when [Griffith] bought [the phone] is not an essential element" and that the essential information from the receipt was the value of the phone. (May 15, 2024 Trial Tr. at 16).

-18-

insufficient to show a *Brady* violation." *State v. Pepper*, 2003-Ohio-3053, ¶ 33 (2d Dist.); *see also State v. Eubank*, 38 Ohio App.3d 141, 146 (6th Dist. 1987) (prosecution's failure to disclose a tape did not result in a *Brady* violation because "the evidence included in the tape is merely cumulative to that presented at trial"; the parts of the tape that might have aided defendant were already presented at trial through other sources); *State v. Smith*, 2018-Ohio-4691, ¶ 40 (2d Dist.) (where the information on a recording was cumulative to information already known to the defense, the State's failure to disclose the recording was not a *Brady* violation).

{¶31} During the trial, an officer with the Marion Police Department testified that he went to Stinson's residence on the night of the alleged crimes, he saw Stinson's car there, he inspected the vehicle from the outside and did not see anything of note, and he touched the hood of the vehicle—which was cold, indicating it had not been driven recently. (May 14, 2024 Trial Tr. at 363-365, 370). In its judgment entry, the trial court explained that the body camera footage at issue was from officers also at Stinson's residence that night and "showed the Defendant's vehicle"—and therefore found it to be evidence "material for the alibi defense" and relevant to preparation of that defense. (July 26, 2024 Judgment Entry at 10, 17). However, the body camera footage was merely cumulative of other evidence, and the failure to timely disclose it was not a *Brady* violation. Even if the body camera footage would have supported Stinson's alibi defense because it

showed his car was present at his residence on the night of the alleged crimes, the other officer's testimony already established that point.

{¶32} This cumulative-evidence analysis corresponds with a failure to satisfy the materiality requirement for a *Brady* violation. Appellate courts apply a de novo standard of review to *Brady*-violation materiality questions. *See Iacona*, 93 Ohio St.3d at 92-93; *United States v. Phillip¸* 948 F.2d 241, 250 (6th Cir. 1991) ("[b]ecause materiality under *Brady* presents a mixed question of law and fact, . . . our standard of review is de novo"). Even if such cumulative evidence had been disclosed to the defense, it is not probable that confidence in the trial's outcome would be undermined. *See State v. Sowell*, 73 Ohio App.3d 672, 678 (1st Dist. 1991) (undisclosed cumulative testimony was not material because there was no reasonable probability that the duplicative testimony would have produced a different outcome at trial); *see also Brown*, 2007-Ohio-4837, at ¶ 49 (undisclosed evidence is not material simply because it may have helped the defendant prepare for trial).

{¶33} We conclude that the trial court erred in deciding that the State committed a *Brady* violation. *See State v. Brown*, 2017-Ohio-7701, ¶ 38-42 (7th Dist.) (where the State did not disclose a video to defense counsel until during the trial and the trial court granted the defendant's request for a mistrial, the appellate

court found no *Brady* violation and the trial court did not err in denying defendant's motion to dismiss).

### C. The Imposed Sanctions Must Be Vacated

#### 1. The sanctions stem from an erroneous decision

{¶34} Given that the trial court's July 26, 2024 judgment was based on erroneous findings of *Brady* violations, the sanctions imposed in that judgment cannot stand. *See State v. Pate*, 1996 WL 255870, *2 (3d Dist. May 14, 1996); *State v. Umpenhour*, 2000 WL 281746, *1, 4-6 (6th Dist. Mar. 17, 2000) (because there was no discovery violation by the State, the trial court erred in imposing a sanction for the alleged violation).

#### 2. Double jeopardy does not apply

{¶35} We next address whether the trial court's decision to dismiss the case on the basis of double jeopardy must be reversed even if one views the underlying discovery violation as a Rule 16 violation (e.g., as the trial court found on May 15, 2024), instead of the trial court's erroneous finding of *Brady* violations. A de novo standard of review is used in reviewing a decision to grant or deny a motion to dismiss a criminal indictment on double-jeopardy grounds. *See State v. McFarland*, 2012-Ohio-1991, ¶ 9 (6th Dist.); *State v. Wright*, 2018-Ohio-1281, ¶ 1, 9 (4th Dist.).

##### a. Legal principles

{¶36} The general rule for mistrials is that "the Double Jeopardy Clause is no bar to retrial." *Oregon v. Kennedy*, 456 U.S. 667, 673 (1982). In *Kennedy*, the

U.S. Supreme Court held "there is a narrow exception" to that rule. *Id.* When a defendant is granted a mistrial, the circumstances in which he "may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id.* at 679. The Court further explained:

> Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

*Id.* at 675-676.

{¶37} The Supreme Court of Ohio has adopted the same principles.[3] *State v. Loza*, 71 Ohio St.3d 61, 70 (1994). "When a trial court grants a criminal defendant's request for a mistrial, the Double Jeopardy Clause does not bar a retrial," although "[a] narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial." *Id.* Ohio courts have applied the general rule and exception

---

[3] The protections afforded by the Double Jeopardy Clauses of the Ohio Constitution and the U.S. Constitution are coextensive. *State v. Brewer*, 2009-Ohio-593, ¶ 14. Additionally, the Fourteenth Amendment to the U.S. Constitution made the Double Jeopardy Clause of the Fifth Amendment applicable to the states. *State v. Loza*, 71 Ohio St.3d 61, 70 (1994).

from *Kennedy* to cases involving discovery or *Brady* violations, followed by a mistrial. *E.g., id*. at 64, 70-71 (where the trial court granted a mistrial following the State's failure to disclose exculpatory evidence during discovery, affirming denial of motion to bar retrial on double jeopardy grounds); *Brown*, 2017-Ohio-7701, at ¶ 2-9, 25, 35 (7th Dist.).

### b. Application of legal principles

{¶38} Although the trial court noted it greatly preferred that the case be adjudicated on the merits, it decided that double jeopardy applied and, therefore, it was "unfortunately necessary" to dismiss the case with prejudice. (July 26, 2024 Judgment Entry at 27). This indicates the trial court would not have dismissed the case with prejudice absent its determination that double jeopardy applied. The trial court based that decision on what it found to be a "pattern of non-disclosure in this case and others." (*Id.*). After listing other cases in which it identified discovery issues by the Marion County Prosecutor's Office, the trial court found that jeopardy attached here and that "systemic prosecutorial failures . . . goad mistrials, and therefore warrant finding that double jeopardy applies." (*Id.* at 26).

{¶39} Although we understand the trial court's frustration and do not disregard or excuse repeated prosecutorial discovery errors, we disagree with the trial court that the applicable legal test was met. As an initial matter, the prosecutor's tardy disclosure of the body camera videos could not have been an

action intentionally calculated to cause or invite a mistrial—it happened *after* the mistrial had already been declared. More importantly, "[a]fter reviewing the record, we must conclude that the conduct of the state was not intended to provoke [Stinson] into moving for a mistrial." *Loza*, 71 Ohio St.3d at 71. It does not follow from the record that "the prosecutorial conduct in question [was] intended to 'goad' the defendant into moving for a mistrial." *Id.* at 70. We highlight that the record shows the court and defense counsel both believed the prosecutor had no idea the receipt even existed until Griffith mentioned it during cross-examination. *Compare State v. Owens*, 127 Ohio App.3d 65, 67, 69 (6th Dist. 1998) (the State goaded defendant into seeking a mistrial where the prosecutor vigorously fought for months and won the right to keep secret from the defendant an informant's identity—thus depriving defendant from investigating the informant—but, at trial, affirmatively and deliberately told the jury the name of the informant and that they would see a picture of the informant). As one court has explained, the exception from *Kennedy* "prevents prosecutors from sinking a case they knew was doomed to end in an acquittal in the hope of having better luck before a second jury." *United States v. Lewis*, 368 F.3d 1102, 1108 (9th Cir. 2004). Here, there is no indication that the prosecutor believed his case was doomed to end in acquittal and hoped to have better luck in another trial.

{¶40} Consequently, Stinson's retrial was not barred on double-jeopardy grounds, and the trial court erred in finding otherwise and dismissing the case with prejudice. *Brown*, 2017-Ohio-7701, at ¶ 2, 23-35 (7th Dist.) (despite multiple failures to disclose by the State, resulting in multiple mistrials over the course of the case, the Double Jeopardy Clause did not bar retrial); *State v. Roughton*, 132 Ohio App.3d 268, 278 (6th Dist. 1999) ("[w]hile we find the repeated failure to make full, timely disclosure of evidence deplorable, we cannot conclude that the purpose behind the behavior was a desire to force a mistrial").

{¶41} We therefore do not need to address the State's argument that it did not violate Crim.R. 16. Although we find merit in the State's argument that the trial court could have imposed a less severe sanction consistent with the purpose of the rules of discovery, we likewise need not address that issue. *State v. Darmond*, 2013-Ohio-966, syllabus (when deciding whether to impose a sanction for a discovery violation, a trial court must impose the least severe sanction that is consistent with the purpose of the rules of discovery), ¶ 30 (dismissal with prejudice in a criminal case "is extremely severe because it forecloses the possibility of further prosecution; such a sanction should not be imposed without a trial court's specifically weighing and rejecting the feasibility of less severe sanctions"). The trial court finding a double jeopardy violation to dismiss the indictment with prejudice allowed it to avoid the necessity of conducting an analysis of the least severe sanction.

## IV. CONCLUSION

{¶42} For the foregoing reasons, Appellant's assignment of error is sustained. Having found error prejudicial to the appellant in the particulars assigned and argued, we reverse the judgment of the Marion County Court of Common Pleas and remand for further proceedings consistent with this opinion.

***Judgment Reversed***

**WILLAMOWSKI, J., concurs.**

**WALDICK, P.J., concurring separately.**

I fully concur in the legal analysis and holding by the majority in this matter. However, I would find that the actions of the trial court are not only unreasonable, arbitrary and unconscionable, but grievously so. Instead of deciding the issues presented in this case, the trial court chose to justify its ruling by chastising what it considered a "pattern of non-disclosure" by the Marion County Prosecutor's Office, citing prior perceived misconduct in cases that were completely unrelated to the instant case. A criminal trial is not the appropriate vehicle for the trial court to "send a message." Both the Defendant and the State of Ohio are entitled to a fair trial, and the victim is entitled to justice. In this matter the court abused its discretion.

# **JUDGMENT ENTRY**

For the reasons stated in the opinion of this Court, the assignment of error is sustained and it is the judgment and order of this Court that the judgment of the trial court is reversed with costs assessed to Appellee for which judgment is hereby rendered. The cause is hereby remanded to the trial court for further proceedings and for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

 

Mark C. Miller, Judge

 

Juergen A. Waldick, Judge
Concurs Separately

 

John R. Willamowski, Judge

DATED:
/jlm